## OLD MISSION PORTLAND CEMENT CO. v. COMMISSIONER OF INTERNAL REVENUE.
### No. 7195.

Circuit Court of Appeals, Ninth Circuit.
March 12, 1934.

'Geo. E. H. Goodner, of Washington, D. C., for petitioner.

Sewall Key and Helen R. Carloss, Sp. Assts. to Atty. Gen., for respondent.

Before WILBUR and GARRECHT, Circuit Judges, and NORCROSS, District Judge.

GARRECHT, Circuit Judge.

This is a petition to review the findings of fact, opinion, and decision of the United States Board of Tax Appeals, which involved petitioner's income taxes for the years 1923 to 1926, inclusive, and presents for our determination the following questions:

1. Whether the Board's finding that petitioner's limestone properties, known as the Barbee, Underwood, and Flint deposits, had a fair market value as of March 1, 1913, of $63,121, is supported by any substantial evidence.

2. Whether the amortization of bond discount on the bonds of the petitioner's affiliate, the California Central Railroad, held by the petitioner may be deducted in computing the consolidated net income of the affiliated companies for the years 1923 to 1926, inclusive.

3. Whether the petitioner may deduct as business expenses donations to the San Francisco Community Chest, donations to the Y. M. C. A., and an amount paid to a fund to promote a state-wide referendum for an increased gasoline sales tax levy in order to provide additional funds for road building.

The Board made findings of fact which may be briefly stated as follows:

The petitioner is a California corporation organized in 1912 for the purpose of engaging in the manufacture of Portland cement. Its capital consists of 350,000 shares of common stock of the par value of $10 per share. It is the successor of the San Juan Portland Cement Company incorporated in 1906, and was organized by bondholders of said company when it defaulted payment of interest upon its bonds in the amount of $1,300,000. At a sheriff's sale the bondholders purchased all of the assets of the company for $20,700.

These assets so acquired included limestone deposits known as the Barbee, Underwood, and Flint deposits, about 88 miles south of San Francisco, stocks and bonds of the San Juan Pacific Railway Company which connected the deposits with the Southern Pacific Railway (a distance of 7 miles), the Chittenden Ranch, and an unfinished cement plant.

Thereafter the bondholders' committee organized the California Central Railroad Company and turned over to it the stocks and bonds of the San Juan Pacific Railway Company in exchange for the stocks and bonds of the said California Central Railroad Company.

Thereupon the petitioner was organized, and in exchange for 175,000 shares of its common stock of the par value of $10 a share, it acquired from the bondholders' committee the unfinished cement plant, machinery, equipment, etc., which were valued at approximately $500,000 and the lands (2,463 acres) containing the petitioner's deposits. In 1916 the petitioner made the necessary financial arrangements and undertook the completion of its cement plant, which was finished at an additional cost of $500,000, and production started in 1918.

The Barbee deposit was adjacent to the plant; the Underwood and Flint deposits were 2 and 3 miles, respectively, from the plant, and were reached by a narrow gauge railroad constructed after 1913 and extended as operations progressed after 1918. The deposits were exhausted in or about 1927.

In its income tax returns for the years 1918, 1919, 1920, and 1921 the petitioner claimed deductions for depletion of mineral deposits at the rate of 10 cents per ton. Upon its income tax returns for the years 1922, 1923, 1924, and 1925 the petitioner claimed deductions for depletion of mineral deposits at the rate of 20 cents per ton on a valuation of $1,034,398.10 for the deposits on the basis of data furnished in a schedule (Form F) filed December 19, 1922. This schedule indicated that the Underwood deposits had been depleted of lime rock, but not of clay, since 1920; that the Barbee property contained no high-grade limestone but considerable clay; that the Flint property was supplying all the lime rock being used and that it was estimated that it would be exhausted six and one half years from March, 1921, when the plant began using it, although the 1918 estimate had indicated available tonnage for eight years. Between March, 1920, when the Underwood deposit was exhausted, until March, 1921, when the Flint deposit was used, 50,093.50 tons of lime rock were obtained from one E. A. Pearce at 10 cents per ton.

The schedule further showed that the lands had been set up on the books at a valuation of $1,202,653.10, that $48,000 of that amount represented the value of the plant site and $75,000 the value of the Chittenden Ranch for agricultural purposes (the land containing clay not used, but no limestone), and that $45,255 should be deducted as the residual value of the deposit lands, leaving $1,034,398.10 as the value of the deposits. On the basis of a consumption of 329,337.12 tons and a prospective consumption of 1,035,000 tons by the time the Flint deposit was exhausted (less the amount obtained from the Pearce Company) the estimated tonnage to be removed was 1,314,243.62 tons and the division of $1,034,398.10 by that tonnage would give the depletion rate of 79 cents a ton.

On September 23, 1912, the petitioner had purchased the mineral rights to 8,750 acres on the El Gabilan Rancho for 50,000 shares of common stock and suggested in the schedule that an increase of 25 per cent. be allowed in the capacity of the mill; that de-

pletion be figured over an assumed corporate life of 40 years from May 1, 1918, and on such a basis the depletion rate would be over 19 cents per ton. The petitioner therefore adopted the figure of 20 cents a ton.

The Commissioner determined that on March 1, 1913, there were 1,700,000 tons of merchantable limestone in the three said deposits, suitable for the making of Portland cement, and fixed the fair market value thereof on that date at $63,121, or 3.713 cents per ton of limestone in place. In computing petitioner's income for the years here involved, depletion deductions were allowed at the rate of 3.713 cents per ton for the limestone removed and consumed in those years as follows:

| | |
|---|---|
| 1923 | $8,973.73 |
| 1924 | 7,875.87 |
| 1925 | 9,171.74 |
| 1926 | 9,135.69 |

Petitioner claims that due to the scarcity on the Pacific Coast of limestone suitable for making Portland cement, the said deposits had a market value on March 1, 1913, far in excess of that allowed by respondent and approved by the Board.

Throughout the years involved in this proceeding, petitioner owned substantially all of the capital stock of the San Juan Pacific Railway Company, a California corporation, and this latter company owned substantially all of the stock of the California Central Railroad Company, a California corporation. Respondent has ruled that the three companies were affiliated for income tax purposes throughout the years involved in this proceeding and there is no controversy over that ruling.

In 1912, the California Central Railroad Company issued its own bonds at a discount, which discount it amortized over the life of the bonds at the rate of $3,381.18 each year. In computing consolidated net income for the years involved here, respondent has allowed deductions in respect of such bond discount, in the amount of $375.99 for the years 1923, 1924, and 1925, and in the amount of $220.79 for the year 1926. He disallowed the balance of the amount of such amortization applicable to the years in question, because those balances were applicable to bonds held in the respective years by petitioner. In other words, respondent recognized the right of the Railroad Company to amortize and deduct that portion of its bond discount applicable to the bonds held by the public, but disallowed as a deduction that

portion of the discount applicable to the bonds owned by petitioner.

In each of the years 1923 to 1926, inclusive, petitioner donated $1,000 to the San Francisco Community Chest, this amount being the allotment assigned to the petitioner by the Community Chest committee. Publicity through the newspapers and by means of placards on doors was given to such contributions, which petitioner claims resulted in good will and increased business. In 1926 petitioner donated $2,500 to the San Francisco Y. M. C. A., which was then beginning the erection of a new building. The purchase of cement materials for said building was to be allotted to the various cement companies in proportion to their donations. As the result of said donation, petitioner furnished its proportionate share of the material that went into the building. In 1926, petitioner contributed $3,000 to a fund to be used in a state-wide campaign on a referendum to increase the gasoline sales tax in California, in order to provide the state with much needed funds for additional road construction and maintenance over a period of twelve years. The referendum was successful and the state embarked on an extensive road building campaign, using large quantities of cement and cement materials of which petitioner furnished its proportionate share. All of these deductions were disallowed.

In the petition for review the petitioner has made thirty-two assignments of error. No good purpose can be served by enumerating these in detail or in discussing them at length. The opinion will pass upon the points raised, it being sufficient here to say that six of these assignments (1 to 6, inc.) concern six exhibits, the same being petitioner's income tax returns for 1912, 1913, 1914, 1915, 1916, and 1917 introduced by respondent, over the objection of petitioner. Five of these assignments (7 to 11, inc.) concern petitioner's income tax returns for the years 1918, 1919, 1920, 1921, and 1922, likewise introduced by respondent over petitioner's objection. Five of these assignments (12 to 16, inc.), being petitioner's capital stock tax returns for the years 1917, 1918, 1919, 1920, and 1922, introduced by respondent over petitioner's objection. Another assignment (17) being abatement claim in respect to 1917 capital stock tax assessed against petitioner, likewise admitted in evidence, and three assignments (18 to 20, inc.), being letters from the petitioner, likewise objected to and admitted. Eight assignments of error (21 to 28, inc.) are predicated on alleged error of the Board in its findings as to value of limestone deposits. The remaining assignments of error (30, 31, and 32) are upon the failure of the Board to allow the deductions hereinafter discussed.

█ The Board of Tax Appeals determined that petitioner's limestone deposits had a fair market value as of March 1, 1913, of $63,121. At the hearing before the Board respondent introduced a statement to show how the Commissioner of Internal Revenue arrived at the depletion deductions, which, with the determination by the Commissioner that the amount stated, $63,121, was the fair market value of the deposits as of the date named, constituted a prima facie case, which must stand unless overcome by substantial evidence. Nichols v. Commissioner (C. C. A.) 44 F.(2d) 157.

██ It is likewise true that this value was an issue of fact and the finding of the Board of Tax Appeals must be sustained if based upon any substantial evidence. Phillips v. Commissioner, 283 U. S. 589, 51 S. Ct. 608, 75 L. Ed. 1289. And this court has held that we are bound by the decision of the Board, where the evidence does not compel a contrary conclusion. Pedder v. Commissioner (C. C. A.) 60 F.(2d) 866.

█ The petitioner produced three expert witnesses who testified at length and gave their opinions as to the value of the property in question as of March 1, 1913. One of these witnesses, who had formerly been connected with the petitioner, but who had no interest at the time of testifying, stated that in his opinion the fair market value as of March 1, 1913, was 82 cents a ton; another expert witness, who at the time of testifying was an official of the petitioner, testified that the fair market value of the deposit of limestone at the date in question was approximately 78 cents; and the other expert, who had no connection with the properties involved in any way, gave the figure of 89.2 cents per ton as a fair value of the date in question. This court has held that "the presumption of correctness is attached to the Commissioner's findings." Matern v. Com'r, 61 F.(2d) 663, 666. So from the outset the determination by the Commissioner of the fair market value of the property in question was prima facie correct and the burden of establishing it as incorrect was upon the petitioner.

█ Petitioner insists that because there was no witness to contradict the testimony of its expert witnesses the Board was required to accept it as true. The Board was

not bound by the opinion testimony of petitioner's experts. Where the Board itself has experience and knowledge or where there are other facts or any substantial evidence upon which it may predicate a judgment, it may ignore the opinions of expert witnesses. This is particularly true when their testimony as to values was in conflict with other facts disclosed. The weight of the evidence is a matter for the judgment of the Board, and its finding, where supported by any substantial evidence, is conclusive. Had the testimony of these experts stood alone and uncontradicted it might have been sufficient to overcome the presumption of correctness of the Commissioner's findings. However, respondent while offering no oral testimony did introduce in evidence certain exhibits, being petitioner's income tax returns for the years 1913 to 1922, inclusive, and the capital stock returns from 1917 to 1922, inclusive, and certain letters of the petitioner.

To the admission of this evidence petitioner objected, but in so far as these documents had a bearing upon the determination of the issue of fair market value, they were admissible, particularly as they tended to contradict the evidence of the expert witnesses, who assumed to base their estimates partially upon their knowledge of subsequent events and the prospective earnings from these cement deposits.

 Statements by petitioner in several of these exhibits that none of its stock had ever sold for more than $2 per share, and that some had been exchanged at 75 cents a share, was admissible, because the deposits here involved had been acquired by the petitioner together with the Chittenden Ranch and the incompleted cement plant by exchanging therefor 175,000 shares of its stock. If at the time this stock was valued at the maximum price for which it ever sold, the value of all these assets at the time would have been $350,000. As petitioner valued the machinery and plant alone at $500,000, the Chittenden Ranch at $75,000 for agricultural purposes, and the residual value of the land at $45,255, a valuation of the cement deposits at $63,121 could not be considered unwarranted.

To all of these, except one, the petitioner objected. These exhibits contained certain statements and admissions against interest which were given some weight in the decision of the case by the Board of Tax Appeals.

From the findings and opinion of the Board it appears that only such matter in these documents as was in the nature of admissions against interest or pertinent was given consideration in arriving at its decision. The ruling of the Board permitting these exhibits to be received in evidence for the purpose stated was not error.

The petitioner during the taxable years 1923 to 1926 was affiliated with the California Central Railroad Company and the San Juan Pacific Railroad Company, and the affiliated companies filed consolidated returns.

In 1912 the California Central Railroad Company issued its own bonds at a discount. In amortizing this bond discount over the life of the bonds, the amount of the amortization applicable to each of the four years under consideration is $3,381.18. The Commissioner allowed part of this amount as deductions in the consolidated returns for 1923, 1924, 1925, and 1926, the amounts disallowed being the amortization on bonds held by petitioner. The Board sustained the Commissioner's action.

There is no express provision in the Revenue Act which grants the right to a taxpayer to deduct an amortized discount over the life of the bonds where the bonds are issued at a discount, but this privilege is derived from certain Treasury Regulations. The regulations here invoked as the basis for this claim are:

Treasury Regulations 62: Art. 545. * * * (3) (a) If bonds are issued by a corporation at a discount, the net amount of such discount is deductible and should be prorated or amortized over the life of the bonds.

Treasury Regulations 69: Art. 635. Consolidated net income of affiliated corporations.—Subject to the provisions covering the determination of taxable net income of separate corporations, and subject further to the elimination of intercompany transactions (whether or not resulting in any profit or loss to the separate corporations), the consolidated taxable net income shall be the combined net income of the several corporations consolidated.

 Under these regulations the Commissioner and the Board of Tax Appeals have uniformly held that the acquisition of bonds of a subsidiary company by a parent company, as in this case, are intercompany transactions, and the amortization of discount on such bonds is not deductible in a consolidated return. While the point is not without difficulty, we are unable to say that the determination of the Board of Tax Appeals is not correct.

Petitioner urges as error failure of the Board to allow as deductions from income the amount of $1,000 paid by petitioner for each of the years 1923 to 1926, inclusive, as its allotment to the San Francisco Community Chest, also the failure to allow as a deduction $2,500 paid by petitioner in the year 1926 to the San Francisco Y. M. C. A., and, further, the failure to allow as a deduction the amount of $3,000 paid by petitioner in the year 1926 to a fund to promote a statewide referendum for an increased gasoline sales tax levy.

Although the statutes permit deductions for contributions to charitable organizations by individuals, there is no provision for such deductions by corporations. It is provided, however, by certain Treasury Regulations that certain donations made by a corporation may be deducted as an ordinary and necessary business expense, where such donations are to institutions conducted for the benefit of the corporation's employees, also donations "for a benefit flowing directly to the corporation as an incident to its business."

The donations to the San Francisco Community Chest clearly come within the class of contributions from which only indefinite and indirect benefit may be expected, which would not bring these within the regulations. The contribution listed on petitioner's book as "All California Highway Lobbying $3,000," and concerning which petitioner's witness testified that the term lobbying might be interpreted as being correct, is not such an outlay as constitutes an ordinary and necessary business expense. There was no error in not allowing this item. The contribution of $2,500 to the Y. M. C. A. of San Francisco toward its building fund was made with the understanding that so far as the cement supplied in the building concrete construction work was concerned, the petitioner would receive its share on the proportional basis of its donation, and that petitioner as a result did receive its proportion of the cement work for that individual job, and for other work in the immediate vicinity which came under the Y. M. C. A. project. We are constrained to hold that petitioner's so-called donation was in fact a business expenditure made for the purpose of directly acquiring more business and so deductible in computing income as a business expense.

Accordingly the petition of the taxpayer praying that the subscription relating to the Y. M. C. A. be treated as an ordinary and

necessary business expense is granted. The order and decision of the Board of Tax Appeals in all other respects is affirmed.