## RICHARDS v. COMMISSIONER OF INTERNAL REVENUE.

### No. 7835.

Circuit Court of Appeals, Ninth Circuit.
Jan. 20, 1936.

C. E. McDowell, of Los Angeles, Cal., for petitioner.

Frank J. Wideman, Asst. Atty. Gen., and Sewall Key, Joseph M. Jones, and Berryman Green, Sp. Assts. to Atty. Gen., for respondent.

Before WILBUR, DENMAN, and HANEY, Circuit Judges.

HANEY, Circuit Judge.

Petitioner asks this court to review a decision of the Board of Tax Appeals upholding the Commissioner's decision that certain real property owned by petitioner and his wife was not a "capital asset" and that therefore the joint income tax return of petitioner and wife showed a deficiency inasmuch as the return filed included the amount received from the sale of this real property as a capital gain.

Petitioner seeks to bring the income received under the provisions of the Revenue Acts of 1926 and 1928, the returns in question being for the years 1927 and 1928. The statutes, so far as applicable here, are substantially alike, and levy a level tax of "$12\frac{1}{2}$ per centum of the capital net gain." Revenue Act 1926, § 208 (b), 44 Stat. 20; Revenue Act 1928, § 101(b), 45 Stat. 811. These acts (sections 208 (a) (1) and 101 (c) (1) define "capital gain" to mean "taxable gain from the sale or exchange of capital assets." Therefore, be-

fore petitioner may claim the income in question to be capital gain, he must show that the real property sold by him was a "capital asset." The appropriate acts (section 208 (a) (8), 44 Stat. 19; section 101 (c) (8), 45 Stat. 811) define "capital assets" as follows:

"'Capital assets' means property held by the taxpayer for more than two years (whether or not connected with his trade or business), but does not include * * * property held by the taxpayer primarily for sale in the course of his trade or business."

For these acts, see Historical Note to 26 U.S.C.A. § 101.

The Commissioner contends that the real property in question was not a capital asset, and the issue presented to the Board was whether or not the real property was "held by the taxpayer primarily for sale in the course of his trade or business." The determination of this issue is the ultimate fact. See Tricou v. Helvering (C. C.A.9) 68 F.(2d) 280, certiorari denied 292 U.S. 655, 54 S.Ct. 865, 78 L.Ed. 1503, and rehearing denied 293 U.S. 629, 55 S. Ct. 67, 79 L.Ed. 715, and Winnett v. Helvering (C.C.A.9) 68 F.(2d) 614.

■ The Board determined the ultimate fact to be:

"* * * That the lots were held by the petitioner primarily for sale in the course of his business. * * *"

We are limited therefore to an examination of the record to ascertain whether or not there is any substantial evidence to sustain the finding. Helvering v. Rankin, 295 U.S. 123, 55 S.Ct. 732, 79 L.Ed. 1343, and cases cited; Pedder v. Commissioner of Internal Revenue (C.C.A.9) 60 F.(2d) 866; Westlake Public Market v. Commissioner of Internal Revenue (C.C.A. 9) 69 F.(2d) 291; Old Mission P. Cement Co. v. Commissioner of Int. Rev. (C.C.A. 9) 69 F.(2d) 676, affirmed 293 U.S. 289, 55 S.Ct. 158, 79 L.Ed. 367; Helvering v. Ackerman (C.C.A.9) 71 F.(2d) 586; Commissioner of Internal Revenue v. Gerard (C.C.A.9) 75 F.(2d) 542. Petitioner concedes that he subdivided his real property and held it thereafter primarily for sale, and says in his brief:

"* * * This leaves the question open as to whether or not the real property was for sale 'in the course of his trade or business.' It is on this last phrase only that petitioner and respondent differ. * * *"

■ The question before this court, then, is: Is there any substantial evidence to support the finding of the Board that petitioner engaged in a trade or business of selling real property by the sale of the lots in question?

The evidentiary facts from which the finding was made are set out in the opinion of the Board. These facts were taken from two affidavits with exhibits attached which were submitted to the Board upon a stipulation that they might be received in evidence. These evidentiary facts are undisputed, and are as follows:

"* * * Since prior to 1920 the petitioner, for himself or as a member of a partnership, has been engaged in the business of raising, packing, buying, and marketing farm products, particularly lettuce. About September 15, 1920, petitioner and his wife acquired title to approximately 47 acres of land in Los Angeles County, California. About April 30, 1921, they acquired another tract adjoining the above tract, containing about 4 acres. About March 11, 1922, they acquired title to a third piece of land adjacent to the foregoing tracts. These tracts of land at the time of acquisition lay in a very productive farming area and were used by the petitioner in the raising of lettuce and sometimes chicory and endive. They were surrounded by farm lands producing these same vegetables. The products of these adjacent lands, together with the products of the petitioner's own lands, enabled him to make shipments in carload lots.

"In 1912 the petitioner erected buildings and other structures on not over three and one half acres of these lands, which were thereafter used by him as a combined office and residence.

"After the petitioner acquired these properties there was a great deal of real estate activity in the lands between his property and the boundary of the city of Los Angeles. The intervening property began to be subdivided and sold, with the result that the petitioner's property rapidly increased in value. * * * This rise in prices made the use of these lands for gardening purposes unprofitable, and in this way deprived the petitioner of a base from which to ship the vegetables in carload lots.

"In 1925 petitioner determined to subdivide a part of the first parcel of land which he had purchased. In pursuance of this plan on July 15, 1925, he conveyed a

portion of the property to the Security Trust & Savings Bank of Los Angeles (now Security Trust National Bank of Los Angeles) hereinafter referred to as the bank, which accepted it in trust to secure a note of $28,500 which petitioner and his wife owed the bank, and upon further trust to subdivide and sell the property conveyed. Under the deed of trust petitioner and his wife agreed to pay all taxes and assessments levied on the property, to pay principal and interest on all indebtedness secured by the trust, to pay all claims, liens and encumbrances and defend all suits affecting the property, to pay for all improvements ordered by him or his agent, and to file with the trustee a copy of each contract for improvements to be placed on the property. The property was to be subdivided and improved by the petitioner and his wife.

"The deed contained provisions which permitted the trustee, upon default of petitioner and his wife in paying the above amounts, to pay them itself, and gave it recourse against the property. The trustee was authorized to rent, sell and convey the property or any part thereof to such persons and at such times as it deemed best, provided the sale prices of the lands should not be less than those indicated in the schedule to be filed with the deed. The proceeds received from the sales were to be used to pay commissions and to release liens, the balance to go in what was termed a general fund, out of which the cost and expenses of the trust and certain other expenses were to be paid, and what remained over was to be paid to the petitioner and his wife. The deed recites that at the request of the petitioner and his wife it appointed P. N. Snyder 'as their exclusive agent to subdivide and improve, and to solicit and obtain purchasers for such part of said property' as was subdivided. He was paid a commission, out of which he was to pay for advertising and other selling expenses of himself and his subagents. Among the duties assumed by the agent was the general care and custody of the subdivided property, and of all improvements placed upon the property, which included the installation of gas, water and electricity. The trustee was not required to procure any insurance on any building upon the property, or to collect or disburse any rentals therefrom. These duties were to be performed by the petitioner and his wife.

"Upon payment in full of the indebtedness secured by the deed and at the request on writing of petitioner and his wife, the trustee was given authority to close and terminate the trust, but was not required to do so as long as any of the covenants contained in any deed remained unperformed. The petitioner and his wife furnished the trustee a list of the minimum prices at which the lots were to be sold. * * *

"The sales of lots in the first subdivision having proved satisfactory, petitioner determined to subdivide other portions of the property above described. By deed of August 6, 1926, the bank accepted in trust property previously conveyed. The provisions of this trust deed resembled the one of July 15, 1925. Afterward, the petitioner and his wife determined to subdivide and sell the remaining portion of the property purchased as hereinabove set forth, and by deed of trust dated January 12, 1927, the bank accepted such property on practically the same trusts as those provided in the deed of July 15, 1925.

"The principal reason for the above conveyances was to have all deeds on lots promptly executed, especially in the absence of the petitioner from Los Angeles. * * * Under each of the deeds, Snyder was appointed by the bank as petitioner's exclusive agent, at their request, for a term of eight months, with the right to serve eight months more upon achieving certain results, and upon the termination of his employment the trustee was to appoint as agent for the petitioner and his wife such person as they directed, all sales, however, to be subject to the approval of the trustee of the bank. The petitioner's business of producing, packing and selling lettuce and other vegetables increased from year to year, and he substituted, either by lease or purchase, farming properties for the properties which he subdivided. The petitioner, himself, has never taken part in the subdivision or the sale of the lots in the subdivisions, all of which was done by Snyder. Except as herein set forth, the petitioner has never engaged in the business of buying and selling real estate or dealt therein. He has not been licensed as a broker to buy or sell real estate."

In Flint v. Stone Tracy Co., 220 U.S. 107, 171, 31 S.Ct. 342, 357, 55 L.Ed. 389, Ann.Cas. 1912B, 1312, we find the following definitions:

" 'Business' is a very comprehensive term and embraces everything about which a person can be employed. Black's Law Dict. 158, citing People ex rel. Hoyt v. Tax Com'rs, 23 N.Y. 242, 244. 'That which occupies the time, attention, and labor of men for the purpose of a livelihood or profit.' 1 Bouvier's Law Dict., p. 273."

Concerning these statements it was said in Von Baumbach v. Sargent Land Co., 242 U.S. 503, 515, 37 S.Ct. 201, 204, 61 L. Ed. 460:

"This court adopted with approval the definition, judicially approved in other cases, which included within the comprehensive term 'business' 'that which occupies the time, attention, and labor of men for the purpose of a livelihood or profit.' "

In Karnuth v. United States, 279 U.S. 231, 243, 49 S.Ct. 274, 278, 73 L.Ed. 677, it was said:

"The contention is that respondents were temporary visitors for business; and the case is therefore narrowed to the simple inquiry whether the word 'business,' as used in the statute, includes ordinary work for hire. The word is one of flexibility; and, when used in a statute, its meaning depends upon the context or upon the purposes of the legislation. * * * 'The true sense in which the word was here employed will be best ascertained by considering the policy, necessity, and causes which induced the enactment.' "

■ We assume, therefore, that it is proper to consider the policy and causes which induced the enactment of the acts in question. In this connection petitioner quotes from p. 42 of the Congressional Joint Committee on Internal Revenue, as follows:

"Taxpayers who realize capital gains fall into two classes—(1) those who *sell property not primarily purchased for purpose of resale,* and (2) those who *sell property purchased for the purpose of resale.* In the former group fall a large number of persons who sell residences, factories, land, and investments often held for a period of many years. In the latter group fall those who *buy* stocks, bonds, and other property *in the expectation of selling on a rising market.* (Italics are counsel's.)

"From the viewpoint of the first group the capital-gains tax must be regarded as a very needful remedial provision. Their sales are often made under some degree of compulsion, such as the necessity of moving to a new neighborhood, retirement from business, settlement of interests of cotenants, etc. Where property has been held for 10 or 15 years and is then sold, the result may be the immediate conversion into cash of a relatively large profit accumulated over a long period of time. To tax that profit at graduated surtax rates, designed primarily to measure the tax on a single year's profit, is obviously unduly burdensome. If it were practicable to segregate such transactions, consideration might properly be given to their special treatment."

The above quotation cited in petitioner's brief does not disclose when or during what Congress the report of the joint committee was issued, but inasmuch as petitioner cites the report in support of his argument, we shall assume that the report so cited had reference to the act of 1926 or 1928. Identical provisions are found in each act with respect to the question here discussed.

It is apparent from this quotation that Congress considered or perhaps contemplated lowering the tax for those owners "who sell property not primarily purchased for the purpose of resale." If Congress carried out such purpose, by the acts, then petitioner should prevail for the facts fall squarely within the purview of such purpose.

■ The statute defines capital assets to mean "property held by the taxpayer for more than two years (whether or not connected with his trade or business)." Standing alone, this broad definition would also include "property purchased for the purpose of resale." But the statute limits the breadth of the definition by excluding three classes of property from being considered as capital assets. The exclusions are: (1) "Stock in trade of the taxpayer"; (2) "other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year"; and (3) "property held by the taxpayer primarily for sale in the course of his trade or business."

We are not concerned with the first two classes of property thus excluded. With respect to the third class of property excluded, the intention as shown by the quotation from the report of the Congressional Joint Committee was probably to exclude "property *held* by the taxpayer pri-

marily for sale in the course of his trade or business." To give effect in the act to the presumed intention, we would have to substitute for the word "held" as used in the act, the word "purchased." This we are unable to do, for Congress could easily have narrowed this third class of property excluded, and since it did not do so, we must assume that the intention of Congress as carried out was not to narrow this third class of property excluded, but was to include in the comprehensive word "held," property which might or might not have been purchased primarily for the purpose of resale.

That petitioner engaged in the business of selling real estate within the broad definition of the Supreme Court cannot be doubted, as shown by the following summary in the opinion of the Board:

" * * * Two of the subdivisions were laid out in 1925 and one in January 1927. The total number of lots in the three subdivisions was 420. Streets and alleys were laid out. * * * The trust deeds disclose elaborate provisions for improvements and places the cost of them on the petitioner and his wife. What these improvements were is not disclosed, except that they included the installation of gas, water and electricity. We are informed that rentals were to be collected by the petitioner and his wife, and that all insurance was to be procured and paid for by them. * * *"

It is quite obvious that the reason petitioner subdivided the land for sale was to obtain a larger profit.

Petitioner contends "that the sale of the real property in question constitutes a liquidation of those particular assets," and cites as authority for the proposition that a liquidation does not constitute engaging in a business, the following cases: Commissioner of Internal Revenue v. Atherton (C.C.A.9) 50 F.(2d) 740; White v. Hornblower (C.C.A.1) 27 F.(2d) 777; Blair v. Wilson Syndicate Trust (C.C.A.5) 39 F. (2d) 43; and Commissioner of Int. Rev. v. Morriss R. Co. Trust No. 2 (C.C.A.7) 68 F.(2d) 648. In each of these cases, the question presented for determination was whether or not the trusts involved were "associations" which would come within the definition of "corporations" as used in the act. It is true that the test applied in the cases last cited appears to be that if the purposes of the trust are liquidation and distribution, then the trust is not such

an "association." We cannot adopt such test to determine what is a "business."

There is substantial evidence to support the finding of the Board, and its decision is therefore affirmed.