## EHRMAN v. COMMISSIONER OF INTERNAL REVENUE.

## HELLER v. SAME.

## HELLMAN et al. v. SAME.
### No. 9723.

Circuit Court of Appeals, Ninth Circuit.
June 6, 1941.

Sidney M. Ehrman, Lloyd W. Dinkelspiel, and Heller, Ehrman, White & McAuliff, all of San Francisco, Cal., for petitioners.

Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key, Benjamin M. Brodsky, and Warner W. Gardner, Sp. Assts. to Atty. Gen., for respondent.

Before GARRECHT, HANEY, and STEPHENS, Circuit Judges.

STEPHENS, Circuit Judge.

The question for determination is whether the United States Board of Tax Appeals erred in concluding that certain gains realized by petitioners from the sales of lots in a subdivision are taxable under the Revenue Act of 1934 as ordinary gains instead of as capital gains as contended for by petitioners. The applicable section of the statute, Sec. 117, Revenue Act of 1934, c. 277, 48 Stat. 680, 26 U.S.C.A. Int.Rev.Acts, page 707, reads,

"(a) General Rule. In the case of a taxpayer, other than a corporation, only the following percentages of the gain or loss recognized upon the sale or exchange of a capital asset shall be taken into account in computing net income: * * * [rates]

"(b) Definition of Capital Assets. For the purposes of this title, 'capital assets' means property held by the taxpayer (whether or not connected with his trade or business), but does not include stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business."

The facts found by the Board of Tax Appeals are substantially as follows, and are not disputed:

I. W. Hellman, Sr., was a banker. At his death in 1920 he left an estate of about $9,500,000, which included a large number of tracts of land, both improved and unimproved, including nine or ten improved tracts in Los Angeles, and six ranch properties, one of which was Repetto Ranch of 1,569.93 acres, located about five miles east of the City Hall of Los Angeles, but outside

the city limits. The ranch properties had been acquired by Hellman, Sr., at least thirty years prior to his death. Repetto Ranch was acquired between 1870 and 1880.

Upon the death of Hellman, Sr., the residue of his estate, including Repetto, passed in equal parts to his children, Florence H. Ehrman, Clara Hellman Heller and I. W. Hellman, Jr., I. W. Hellman, Jr., died about a month later, leaving an estate of about $1,500,000. His interest in Repetto passed to Frances J. Hellman and Wells Fargo Bank & Union Trust Company, as trustees under his testamentary trust. About 1926, Clara Hellman Heller transferred to her son, Edward H. Heller, a one-twelfth interest in Repetto.

Aside from a sale of one of the ranches in order to pay inheritance taxes, and the sales in controversy in the instant action, none of the properties distributed from the Hellman, Sr., estate have been sold. The sales involved in this appeal are from Repetto Ranch.

No particular effort was made to sell Repetto down to 1929. Offers were received and rejected by the taxpayers, who were opposed to a subdivision project and wished to sell outright, either for cash or substantial cash and security for the balance.

In 1929 about 800 acres of Repetto, constituting practically all of the level land of the ranch, were sold to Ransom Corporation, which company proposed to subdivide the land and sell it. The total consideration for the sale was $4,052,000, with a down payment of $250,000 and the balance payable over a period of approximately ten years with interest on the unpaid balance. Title was conveyed to Farmers and Merchants National Bank of Los Angeles, as trustee under "Repetto Land Trust No. 813", which was set up on May 29, 1929.

Ransom Corporation proceeded to develop a portion of the land, but in 1931 and 1932 became involved in difficulties and advised the taxpayers' agent that it could not carry out the entire transaction. After negotiations, the parties on May 16, 1932, entered into a modification of the declaration of trust. Some of the land was released and the total purchase price was reduced. Thereafter Ransom continued its efforts, but in a short time defaulted under the amended agreement, and on December 2, 1932, notified the trustee and the taxpayers that it could no longer proceed. On July 31, 1933, the taxpayers demanded sale and on February 13, 1934, purchased the property at a trustee's sale, and deed was delivered to them on May 30, 1934.

The property so reacquired by the taxpayers had been subdivided into lots, some of which had actually been deeded to purchasers and some of which were under contracts of sale. The uncompleted contracts were acquired by the taxpayers, and the taxpayers assumed certain obligations of Ransom to install improvements such as streets, sidewalks and landscaping.

The Hellman heirs [taxpayers] were then faced with the problem as to what to do with the property which they had reacquired. Their agent, a Mr. Keller, made an investigation of the matter at their request, and recommended to them that they carry on with the subdivision, first reducing the price of the lots to meet the market at that time. The Hamilton Sales Corporation was thereupon employed to carry on the work of the subdivision. A contract was entered into with Hamilton on February 19, 1934, reciting the taxpayers to be the owners of the subdivided lands described, and providing in general for the development and sale of the property. The contract provided that no lot or parcel should be sold at a lesser price than shown in attached schedules, which were subject to change by the taxpayers. The described terms of sales might be changed only upon consent of the taxpayers, who were also to determine the conditions contained in deeds; all contracts of sale were to be made in the name of, and executed by, the taxpayers or their agent; the taxpayers or their agent were to receive the sales price of the property; Hamilton was not to vary the terms of deeds of contracts of sale without the taxpayers' permission; the taxpayers were to pay Hamilton a certain percentage of the gross sale price as selling commission.

Farmers and Merchants National Bank of Los Angeles was appointed by the taxpayers to deliver contracts and deeds, make collections, keep a record of those transactions, and pay commissions. The letter of instructions given to the bank recited that the taxpayers were the owners of the subdivision reacquired from Ransom, and that other tracts would possibly be added later. Two additional tracts were later added to the subdivision, one in 1937 and one in 1938.

In 1934 there were 120 lots sold, for a total sale price of $161,678.87. The total payments made on contracts in 1935 were

$59,625.44. In 1935 186 lots were sold, the total sale price amounting to $230,170. The contract payments amounted to $105,276.70. The tax year involved in this appeal is 1935.

The commissioner determined, and the Board of Tax Appeals sustained his determination, that the 1935 sales were of property held by the taxpayers primarily for sale to customers in the ordinary course of their trade or business, and hence the gains were not capital gains within the meaning of the statute quoted above.

The taxpayers urge that the sales of the property were solely for purposes of liquidation, and that therefore they cannot be said to have been carrying on a "trade or business". This court has heretofore in Richards v. Commissioner, 9 Cir., 81 F.2d 369, 106 A.L.R. 249, and in Commissioner v. Boeing, 9 Cir., 106 F.2d 305, rejected the liquidation test in determining whether or not a taxpayer is carrying on a trade or business. In the Boeing case, supra, 106 F.2d page 309, we laid down the test: "From the cases it would appear that the facts necessary to create the status of one engaged in a 'trade or business' revolve largely around the frequency or continuity of the transactions claimed to result in a 'business' status." We see no reason for departing from these decisions and now holding that the fact that property is sold for purposes of liquidation forecloses a determination that a "trade or business" is being conducted by the seller. See also Welch v. Solomon, 9 Cir., 99 F.2d 41.

Taxpayer attempts to distinguish the Boeing case, supra, on the ground that in that case the court held that the Board's findings that the sales were "casual" could not be upheld in the absence of any substantial evidence, while in the instant case the Board's Findings contain no mention as to whether or not the sales were casual. However, the Board in its opinion states that the contention that the sales were isolated or casual cannot be made, and found as a fact that 186 lots were sold in the tax year. We see no ground of distinction.

Taxpayers suggest in their briefs that they should not be held to have been in the trade or business of real estate subdivision because of the fact that they were forced into the position by reason of the condition of the property when it was reacquired by them from Ransom. They refer to the property as having been acquired by them in a "damaged" state. We fail to see that the reasons behind a person's entering into a business—whether it is to make money or whether it is to liquidate—should be determinative of the question of whether or not the gains resulting from sales are ordinary gains or capital gains. The sole question is—were the taxpayers in the business of subdividing real estate? If they were, then it seems indisputable that the property sold falls within the exception in the definition of capital assets in the statute above quoted—that is, that it constituted "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business".

With this in mind, and applying the test of "frequency or continuity of the transactions" as laid down by us in the Boeing case, supra, it is clear that the Board of Tax Appeals was correct in finding that the taxpayers' gains were not capital gains within the meaning of the statute.

The taxpayers call attention to the fact that the statute involved was amended in 1934 by adding the words "to customers" and "ordinary". It is urged that the addition of these words indicate an intention by Congress to exclude from taxation as ordinary gains sales such as the ones with which we are here concerned. We do not agree. If, as we have held the fact to be here, the taxpayers were in the "trade or business" of real estate subdivision, then certainly the sales of lots were to "customers" in the "ordinary" course of that business.

Finally, the taxpayers allege as error the admission into evidence of testimony of sales of lots and other transactions occurring subsequent to the tax year in question. Testimony was allowed as to the opening of new tracts for subdivision by the taxpayers in 1937 and 1938, and as to the volume of sales of lots subsequent to 1935. The objection is that such evidence is immaterial.

We find no error here. The taxpayers contended at the hearing that the sales of property were isolated and casual, and impelled by the stress of necessity. The evidence now objected to shows a continuation of a uniform course of action, unchanged in quality and increasing in extent and intensity. It has a very definite bearing on the issues of the case, and was properly admitted.

Affirmed.