BLAKE et al. v. KAVANAGH.

No. 9035.

United States District Court
E. D. Michigan, S. D.

Sept. 2, 1952.

180

Phillip Nusholtz, Detroit, Mich., for plaintiffs.

Philip A. Hart, U. S. Atty., and Ruger P. O'Connor, Asst. U. S. Atty., Detroit, Mich., for defendant.

KOSCINSKI, District Judge.

This is a suit for refund of income taxes claimed to have been erroneously assessed against and paid by plaintiffs.

Counsel for both parties stipulated facts which were undisputed, and presented evidence at the trial on contested issues. From the agreed facts and evidence submitted at the trial this court makes the following

### Findings of Fact

1. In 1926, plaintiffs constructed 73 houses for purposes of sale to the public. They retained one dwelling as their residence and succeeded in disposing of the remainder on land contracts within one year after completion of construction.

2. The building project was located near a manufacturing plant of the Ford Motor Company and most of the houses were sold to employees of this plant at a time of great demand for living quarters by workers employed there. A strike and other labor difficulties combined to close the factory, its employees began moving away, and, as a result, all but one of the vendees who purchased houses from plaintiffs defaulted in their contract payments and plaintiffs repossessed themselves of the 71 houses.

3. Plaintiffs made unsuccessful attempts to resell these properties, but were eventually able to rent them under leases for one year with option to purchase and apply rentals paid toward the purchase price. None of the tenants exercised the option to purchase. One dwelling was sold by plaintiffs to their handyman who performed odd repair jobs for them on the project, and who agreed to the application toward the purchase of the house of any sums due him from plaintiffs for work so done. After two years of the lease-with-option-to-purchase arrangement, plaintiffs were unable to interest tenants to lease for an entire year and the dwellings were thereafter rented on a month-to-month basis.

4. Plaintiff Virginia Blake conceded on the witness stand that unfavorable economic conditions then existing compelled them to rent the houses on a month-to-month basis as the only method by which these houses could produce any income.

5. No other sales were made until 1941, when a decorator, periodically employed by plaintiffs in connection with maintenance of the houses, entered into an arrangement for purchase similar to that under which one of the houses was previously sold to the handyman.

6. In 1942, rents were frozen at 1941 rent levels, under housing and rent legislation, and plaintiffs were required to reduce their rents accordingly. Real estate values in the meantime had risen.

7. Plaintiffs in 1942 again decided to offer the dwellings for sale to the public and for that purpose employed the services of one Summers, a real estate broker, granting him an exclusive option to sell all the houses except those which plaintiffs themselves could sell, particularly to tenants then occupying any of the dwellings, on the theory that the case with which such sales could be negotiated would not warrant payment of a commission on the sales.

8. Summers took possession of a vacant house on the project, placed in it a table and chairs for convenience in dealing with customers, advertised the houses for sale in local newspapers, giving the address of the house he so occupied, and when customers called at the given address he accompanied them to the dwellings on the project which were then for sale. Some of the dwellings were vacant while others were tenanted. Purchasers of occupied dwellings were required to arrange for eviction of the tenants under housing and rent legislation permitting purchasers to take possession upon compliance with the Regulations.

9. Plaintiffs personally placed no advertisements for sale. No "for-sale" signs were placed on the premises. It was common knowledge among plaintiffs' tenants, however, that the houses were for sale, due to activities on the premises, such as maintenance of an office by Summers in one of the vacant houses, calls from purchasers in response to advertisements, inspection of houses by prospective buyers preliminary to purchase, changes of occupancy occasioned by the sales, and notices to tenants to vacate whenever a purchaser desired to occupy a house himself.

10. All documents necessary to complete sales were prepared by Summers at his office on the project and all details of the sales were negotiated by him; signatures of plaintiffs on the documents were usually obtained by Summers in the absence of the buyers. Sales which were made by plaintiffs directly to buyers were negotiated at plaintiffs' home without any aid from Summers.

11. Forty-three of the houses were sold in 1942, and nine in 1943, the two tax years involved in this suit. At the end of two years after sales were commenced, plaintiffs had disposed of over 90% of the dwellings. Most of the sales were made by Summers and the remainder by plaintiffs themselves. Sales by plaintiffs personally were made to tenants of homes occupied by them or of other homes on the subdivision, or to persons who never lived on the project but who had information that the houses were for sale through either friends or co-employees living in one of the houses originally constructed by plaintiffs.

12. The house occupied by Summers as an office was later sold by plaintiffs.

13. Defaults again occurred on some of the contracts, repossession followed, and plaintiffs later resold these dwellings.

14. Plaintiff Virginia Blake attended to most of the details of plaintiffs' business at her home, since her husband, Marion Blake, was suffering from asthma and a heart ailment. It was necessary for them to sojourn in a warmer climate each winter, due to the state of the husband's health, and during their absence of four or five months each year checks for any payments due them were forwarded to them in Florida.

15. It does not appear that plaintiffs purchased any other realty either for resale or rental, but they did, on one occasion, offer to purchase the equity of a house-owner on the project who desired to sell. The offer was rejected as inadequate and the equity was sold to other parties for a higher consideration.

16. Plaintiff Marion A. Blake at one time held a real estate broker's license but had not renewed his license since 1924. He did not, therefore, hold such license in 1926 when he originally sold the houses, shortly after their construction.

17. Plaintiffs allege in their complaint, filed in this cause that during the period involved in this suit they were engaged in the real estate business and that their primary source of income was from interest, rentals, and the sale of properties.

## Issue

The question before the court is whether, under the circumstances existing in this case, gains realized from the sale of the dwellings during the taxable years here involved are entitled to capital-gains treatment as gains from sales and liquidation of investment property held by plaintiffs for the production of rental income, as claimed by plaintiffs, or represent ordinary income realized from sale of properties held by plaintiffs primarily for sale to customers in the ordinary course of their trade or business of selling houses, as claimed by defendant.

## Conclusions of Law

1. Determination of the issue before the court involves application of Sec. 117 of the Internal Revenue Code 26 U.S.C., as amended by Secs. 150 and 151 of the Revenue Act of 1942, c. 619, 56 Stat. 798.

2. Subsection (a) (1) of Sec. 117 defines "capital assets" as property held by the taxpayer, whether or not connected with his trade or business, but specifically excludes therefrom property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business.

3. Under Subsection (b) of Sec. 117 only 50% of the gain or loss recognized upon the sale or exchange of a capital asset shall be taken into account in computing net capital gain if the capital asset has been held for more than six months.

4. Recognized gains upon sales or exchanges of property used in the trade or business, plus recognized gains from certain conversions of property used in the trade or business and capital assets held for more than six months into other property or money, are accorded capital-gains treatment if such recognized gains exceed the recognized losses from such sales, exchanges, and conversions, under Subsection (j) (2) of Sec. 117.

5. Subsection (j) (1) defines "property used in the trade or business" as "property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23(l), held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not * * * (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business."

6. There is no fixed formula or rule of thumb for determining whether property sold by a taxpayer was held by him primarily for sale to customers in the ordinary course of his trade or business so that gain from such sales is taxable as ordinary income, but each case must rest upon its own facts. King v. Com'r of Int. Rev., 5 Cir., 189 F.2d 122; Mauldin v. Com'r of Int. Rev., 10 Cir., 195 F.2d 714. Whether or not a taxpayer is engaged in a trade or business is a question of fact. Higgins v. Com'r, 312 U.S. 212, 61 S.Ct. 475, 85 L.Ed. 783; Harriss v. Com'r, 2 Cir., 143 F.2d 279, 281.

7. Facts to be considered in determining whether property sold by a taxpayer was held by him primarily for sale to customers in the ordinary course of his trade or business are, among others, the purpose for which the property was acquired, whether for sale or investment, the number, continuity and frequency of sales, as opposed by isolated transactions, activity of the seller or those acting under his instructions or in his behalf, the extent or substantiality of the transactions, and any other facts tending to indicate that sales or transactions were in furtherance of an occupation of the taxpayer. White v. Com'r of Int. Rev., 5 Cir., 172 F.2d 629; Dunlap v. Oldham Lumber Co., 178 F.2d 781; Mauldin v. Com'r of Int. Rev., supra.

8. In 1926, plaintiffs were engaged in the business of improving vacant property by constructing dwellings thereon and selling them to the public. They continued in that business upon re-acquisition of the properties through foreclosure and throughout the period of time they made unsuccessful attempts to re-sell, and also throughout the time during which they leased the properties with option to sell, it being their primary purpose to sell the properties in the course of their business.

9. Although the purpose for which the properties were acquired is not neces-

sarily determinative of the question before the court, since the ultimate question is the purpose for which such properties were held, the former is helpful in such determination. Richards v. Com'r of Int. Rev., 9 Cir., 81 F.2d 369, 106 A.L.R. 249; Rollingwood Corp. v. Com'r of Int. Rev., 9 Cir., 190 F.2d 263; Mauldin v. Com'r of Int. Rev., supra.

10. Research of the law on this question reveals many cases in which courts have held that taxpayers abandoned the original purpose for which they acquired property and later sold such property while it was held by them primarily for sale to customers in the ordinary course of their trade or business. The converse would also be true and taxpayers might abandon the original purpose of selling property to customers in the ordinary course of a trade or business and thereafter hold for investment. The facts in the present case, however, fail to show that plaintiffs abandoned their original purpose of selling the homes; they were thwarted in accomplishing that purpose for a number of years during which there was no market for the houses, but ultimately succeeded in carrying out that purpose when there was again a demand for such dwellings and they could be sold at a fair price. During the intervening period, the properties were held by them primarily for sale to customers in furtherance of their business of selling the houses to the public.

11. Even during that intervening period of time, plaintiffs succeeded in disposing of two houses, despite the prevailing slump in the real estate market.

12. The number, continuity, and frequency of the sales, as borne out by the evidence, is such as to warrant a conclusion that, during the taxable years in question, plaintiffs were engaged in the business of selling improved realty to the public.

13. While plaintiffs personally exerted a negligible amount of effort in effecting the sales during the taxable years in question, that fact is of little consequence under the circumstances appearing here. Plaintiff Marion Blake was unable to attend to these details because of his ad-

vancing years and his ill health. Plaintiff Virginia Blake, in addition to management of her home and family, apparently contributed some effort in furtherance of the sales plaintiffs made personally. Both of them were absent from the city during four or five months of each year, and it was not only feasible but logical to entrust the conduct of their business to a qualified agent. A business may be conducted through an agent. Brown v. Com'r of Int. Rev., 5 Cir., 143 F.2d 468.

14. Other factors which favor defendant's contention that plaintiffs were engaged in the business of selling houses, in opposition to claims by plaintiffs that they did not participate in the sale, are the establishment of an office by their agent, as well as other activities on this project, as related in the findings of fact, which conveyed the information to tenants and homeowners on the project that the houses still owned by plaintiffs were available for purchase by the general public.

15. Little weight can be accorded plaintiffs' contention that plaintiff Marion Blake held no real estate license at the time the sales in question were made. According to the testimony, he held no broker's license at the time the houses were originally sold in 1926, since he had not renewed his broker's license after 1924, but lack of a broker's license did not prevent him from engaging in the business of selling houses at that time.

16. Plaintiffs also contend that they held the properties for production of rental income and that inadequacy of rental returns, as well as the ill health and advanced age of Marion Blake, induced them to liquidate their holdings, so that the sale was, in effect, only a liquidation and not a sale of properties held primarily for sale to customers in the ordinary course of a business. Even if plaintiffs were motivated in the liquidation of their holdings by the factors mentioned, such circumstances would not prevent the sales being in furtherance of an occupation or business. Mere fact of liquidation does not preclude existence of a trade or business where elements of a trade or business are present. White v. Com'r of Int. Rev., supra; Ehr-

man v. Com'r of Int. Rev., 9 Cir., 120 F.2d 607.

17. For reasons herein stated, this court concludes that, at the time the properties involved in this suit were sold by plaintiffs, such properties were held by them primarily for sale to customers in their trade, business, or occupation as sellers of real estate, and that gains on such sales were ordinary income, taxable as such.

18. Judgment in accordance herewith.