**HOLLIS et al. v. UNITED STATES.**
Civ. No. 29322.

United States District Court
N. D. Ohio, E. D.
March 19, 1954.

I. Walter Sharp and James C. Weir, of Hauxhurst, Inglis, Sharp & Cull, of Cleveland, Ohio, for plaintiffs.

Andrew D. Sharpe and Harlan Pomeroy II, Special Assts. to the Atty. Gen.; H. Brian Holland, Asst. Atty. Gen., Washington, D. C., and John J. Kane, Jr., U. S. Atty., Cleveland, Ohio, for the United States.

McNAMEE, District Judge.

In this action, brought under favor of Title 28 U.S.C.A. § 1346(a) (1), plaintiffs seek to recover $4,502.61 with interest, on the ground that the Commissioner of Internal Revenue erroneously assessed and collected this amount as income tax for the year 1949.

The issue presented is whether oriental art objects sold by the partnership of Hollis & Company were capital assets or property held primarily for sale to customers in the ordinary course of business within the meaning of Section 117(a) (1) of the Internal Revenue Code, 26 U.S. C.A.

It is plaintiffs' position that the art objects are capital assets. The Government contends that they are property held primarily for sale in the ordinary course of business.

The facts are not in dispute but are unique and merit a somewhat extended statement. Howard Hollis was Curator of Far Eastern and Near Eastern Art at the Cleveland Museum of Art from 1929 through 1948. He is one of the leading authorities in the United States on Chinese and Japanese art. In the summer of 1946 he was granted a year's leave of absence from the Museum to take the position of Chief of the Arts and Monuments Division of the Allied Forces in Japan. His duties in that position were to make recommendations to General MacArthur for the protection, salvage, preservation or disposition of certain arts and monuments. While in Japan Hollis became aware of the opportunity to acquire unusual and unique objects of art at most attractive prices. Many wealthy Japanese who possessed rare and valuable art objects and who had suffered serious economic loss from the war were willing for the first time to dispose of these art objects. This condition, together with the favorable rate of exchange, made possible the purchase of these items at comparatively low prices. Upon his return to the United States Hollis interested a limited number of his friends in the possibilities of profit inherent in this situation. Under date of August 1, 1948 a syndicate agreement was executed by Hollis and six other persons. The name of the syndicate is Hollis & Company and its stated purpose is "acquiring as an investment a limited number of oriental art objects to be purchased by Hollis on a trip which he proposed to make to Japan, such objects to be disposed of as and when their potential increment in value appears to be fully realized and inflationary economic trends warrant."

Provision was made in the syndicate agreement for a capital investment of $33,000, to be increased by an additional $16,500 if circumstances warranted.

Hollis himself was without available capital, but through advancements from the other members of the syndicate (which he agreed to repay with interest) he received a fifty per cent. interest therein. The agreement also provided that Hollis was to receive a ten per cent. commission on the gross selling price of all art objects, which was to be deducted before computation of the net profits, and provision was also made for a drawing account to Hollis of $500 per month. As of January 31, 1948 Hollis resigned his position with the Cleveland Museum of Art and left for Japan on January 3, 1949. He was in Japan about three months, during which time he purchased 157 art objects consisting of 194 individual pieces. Apparently, in order to purchase some of the more valuable objects, Hollis was required to and did buy some objects in the lower price range. All of these objects were shipped by air to the United States and arrived in this country about the same time that Hollis returned. Immediately after his arrival on the West Coast Hollis commenced selling the art objects. Sales were made to the Seattle Museum of Art, the Cleveland Museum of Art, the Toledo Museum of Art, and others. Some sales were made within three weeks of the purchase of the objects in Japan. The objects were kept at Hollis's home in Cleveland Heights, where they were displayed to prospective purchasers. There was no advertising and no published price lists. Hollis was well known to the connoisseurs of foreign art objects in the United States as well as to art collectors and art museums in this country. During the year 1949 Hollis had no other business and devoted most of his working time to the affairs of Hollis & Company. His only sources of income during that year were the commissions on sales and his share of the profits of the syndicate. He made three short trips and two long trips out of Cleveland in furtherance of the sale of the art objects. The gross sales of the syndicate for the year 1949 amounted to $65,165, which yielded a substantial profit. From his share of the profits and his commissions in 1949

Hollis received about $29,000. The number of objects sold during 1949 was twenty-five, representing fourteen separate transactions. It was understood at the time of the formation of the syndicate that it was to be a "one venture proposition," and that the disposition of all the objects purchased probably could not be made for a period of several years. A distribution of profits was made by Hollis & Company in 1949 and annually thereafter. In accordance with the syndicate agreement no additional art objects were purchased. However, on April 1, 1950 a second syndicate was formed. This was known as Howard Hollis & Company. Its purpose was to deal in oriental art objects and it differed from the original syndicate in its stated purpose and in the method of distributing profits. Hollis received a sixty per cent. interest in the second partnership and it was agreed that only fifty per cent. of the net profits of Howard Hollis & Company were to be distributed annually to the syndicate members. Unlike the first syndicate, Howard Hollis & Company could thus use part of its undivided profits for the replenishment of its inventory of art objects. The second syndicate agreement was executed by Hollis and four of the original six members of the first partnership. Under the terms of the second agreement Hollis also was to receive a ten per cent. commission on sales and a drawing account of $500 per month. Hollis made trips to Japan and purchased additional art objects on behalf of Howard Hollis & Company. Meanwhile, in the year 1950, sales were made by Hollis & Company in the amount of $51,675. In the years 1951, 1952 and 1953 sales were made on behalf of both partnerships. The inventory of each partnership was segregated and displayed at the home of Hollis, and, as was true in the case of the first partnership, there was no advertising or publication of price lists of the objects owned by the second syndicate. The accounts of both partnerships were kept by a bookkeeper in the office of the law firm representing

the syndicates and were designated as "Hollis No. 1" and "Hollis No. 2."

In the first year of its operation Howard Hollis & Company sold only eight more objects than did the first syndicate. In its second year Howard Hollis & Company sold eight less objects than Hollis & Company, and in the third year both partnerships sold the same number. The ratio of gross profits to gross sales of both partnerships for a period of three years shows a slightly higher average percentage of profits for Hollis & Company, but this is accounted for largely by the more favorable rate of exchange that was in effect at the time the purchases were made for the first syndicate.

Section 117(a) (1) of the Internal Revenue Code provides in part:

"§ 117. Capital gains and losses.

"(a) *Definitions.* As used in this chapter—

"(1) *Capital assets.* The term 'capital assets' means property held by the taxpayer (whether or not connected with his trade or business), but does not include stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or properly held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business * * *."

■ It is conceded by plaintiffs that Howard Hollis & Company is a dealer in oriental art objects and that the profits realized by that partnership constituted ordinary income. However, plaintiffs contend that the art objects of Hollis & Company were held for investment and that profits derived from their sale must be treated as capital gains. Plaintiffs' argument is premised in part upon the declared purpose of the syndicate members of Hollis & Company to hold the art objects as an "investment." But merely designating the purchase and sale of art objects as an "investment" is not decisive. While the stated purpose for which property is acquired is entitled to

some weight, "the ultimate question is the purpose for which the property is held." Rollingwood Corp. v. C. I. R., 9 Cir., 190 F.2d 263, 266; Mauldin v. C. I. R., 10 Cir., 195 F.2d 714; Richards v. C. I. R., 81 F.2d 369, 106 A.L.R. 249.

Plaintiffs also rely upon the fact that Hollis & Company was a "one venture proposition" and contemplated no replenishment of inventory. In Ehrman v. C. I. R., 9 Cir., 120 F.2d 607, 610, the court said:

"We fail to see that the reason behind a person's entering into a business—whether it is to make money or whether it is to liquidate—should be determinative of the question of whether or not the gains resulting from sales are ordinary gains or capital gains."

Cf. Richards v. C. I. R., supra.

■ Hollis was impressed with the opportunities for profit in selling art objects that resulted from the post-war economic condition of the Japanese people. He enlisted the financial aid of his associates and offered them a chance to participate in what promised to be a profitable venture. The members of the syndicate knew they were entering into a new and untried business venture but were willing to finance and participate in the enterprise as an experiment. Notwithstanding the stated purpose of "acquiring an investment" it was contemplated that sales efforts were to be made immediately upon the return of Hollis from Japan. After nine months of operation it was demonstrated that Hollis's optimistic view of the possibilities of profit were fully warranted. The profits realized from the sale of but a small portion of the objects purchased indicated that the long-term prospects of such a business were most favorable. Hollis then decided that it would be advantageous to engage in the business of dealing in oriental art on a permanent basis. This was the purpose of the formation of the second syndicate. Following the organization of Howard Hollis & Company and for a period of several years,

art objects purchased by both syndicates were sold, and the plans, policies and procedures followed in connection therewith were the same for each partnership. It is conceded that all of the essential criteria of a business enterprise are present in the operations of Howard Hollis & Company. I am of the opinion that the same criteria appear in the operation of Hollis & Company. The syndicate of Hollis & Company provided for a drawing account of $500 per month for Hollis, effective upon his return from Japan. Hollis was to receive a commission on sales, and his selling efforts began immediately upon his return to this country. Sales were made within a short time after his return, and the sales were regular, substantial and continuous. As is clearly shown by the evidence, there is a limited number of potential buyers of oriental art objects. Because of the restricted market and the nature of the business, it was probably considered unnecessary to advertise or to publish price lists. Both in the number of transactions and in the amounts realized from sales there was little difference in the operations or results of the two partnerships. The sales of Hollis & Company were not extraordinary. As is true with the sales of Howard Hollis & Company, they were sales in the ordinary course of business.

Plaintiffs also contend that being the first to sell oriental art objects in this country, Hollis & Company had no customers. I suppose it fair to say that the first person who in 1859 bought a pound of tea from The Great Atlantic & Pacific Tea Company was just as truly a customer as the housewife who does her weekly shopping in one of the corporation's modern chain stores. Those whose custom the taxpayer seeks are its customers. Goldsmith v. C. I. R., 2 Cir., 143 F.2d 466. Hollis & Company was a "middleman" engaged in the distribution of art objects to a class different from those from whom it bought. Seeley v. Helvering, 2 Cir., 77 F.2d 323. Although the Goldsmith case, supra, involved the wholly dissimilar subject-matter of the sale of motion picture rights by a playwright,

the concurring opinion of Judge Learned Hand in that case is instructive and relevant here. Among other things, Judge Hand said [143 F.2d 468]:

"Nevertheless, the business may consist of selling these goods in 'ordinary course', to those whose custom the taxpayer seeks; and these are his 'customers.' That the purpose of Congress was also not to treat such transactions as 'capital gains or losses' is patent. Although each transaction is the sale of 'property held by the taxpayer,' it is not considered as separate, but the transactions are all massed together for tax purposes as a single source of ordinary income, quite as though the taxpayer were giving his services for hire upon separate occasions. How numerous such transactions must be the statute answers only by the test that collectively they must constitute a 'trade or business.'"

The cases of Guthrie v. Jones, D.C., 72 F.Supp. 784; Three-States Lumber Co. v. C. I. R., 7 Cir., 158 F.2d 61; Fahs v. Crawford, 5 Cir., 161 F.2d 315, and the Tax Court cases cited and relied upon by plaintiffs, are not controlling here. Higgins v. C. I. R., 312 U.S. 212, 61 S.Ct. 475, 85 L.Ed. 783, also cited by plaintiffs, is not relevant. Nor does this case state the law now in effect. The Higgins case was decided in 1941 and was overruled by Congress in the 1942 amendment of Section 23(a) (2) of the Internal Revenue Code, which provides for the deduction of "expenses paid or incurred * * * for the production or collection of income, or for the management, conservation, or maintenance of property held for the production of income." There are no reported cases analogous on the facts. The issue here presented is one of fact or, at most, a mixed question of law and fact. The reasoning of the cases of Rollingwood Corp. v. C. I. R.; Mauldin v. C. I. R.; Richards v. C. I. R. and Goldsmith v. C. I. R., supra, provides the more reliable guide to appropriate action. See also Snell v. C. I. R.,

5 Cir., 97 F.2d 891. Cf. Fackler v. C. I. R., 6 Cir., 133 F.2d 509.

I think it beyond question that Hollis & Company held the art objects for sale to its customers in the ordinary course of business.

In 59 Yale Law Journal, page 838, Peter Miller of the New York Bar says:

"Assuming that the federal income tax should treat like transactions alike, the special treatment accorded capital gains can be justified only if the transactions giving rise to such gains have characteristics which set them apart from transactions resulting in ordinary income."

The transactions of Hollis & Company are in all their essentials like the transactions of Howard Hollis & Company. And for the purposes of the Internal Revenue Act should be treated alike.

Judgment may be entered for defendant.