### VICTORY HOUSING NO. 2, INC., PETITIONER, v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 30299. Promulgated June 6, 1952.

*Carl T. Smith, Esq.*, for the petitioner.
*Marvin E. Hagen, Esq.*, for the respondent.

468

472

OPINION.

BLACK, *Judge:* The question in this proceeding is whether the gain from the sale of houses by petitioner during the fiscal years is taxable as capital gain as petitioner contends or as ordinary income as the respondent contends. The applicable statutes are contained in section 117(a) and section 117(j) of the Internal Revenue Code. During the taxable years before us section 117(j) (1) of the Code reads as follows:

SEC. 117. CAPITAL GAINS AND LOSSES.

\* \* \* \* \* \* \*

(j) GAINS FROM LOSSES FROM INVOLUNTARY CONVERSION AND FROM THE SALE OR EXCHANGE OF CERTAIN PROPERTY USED IN THE TRADE OR BUSINESS.—

(1) DEFINITION OF PROPERTY USED IN THE TRADE OR BUSINESS.—For the purposes of this subsection, the term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23 (1), held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not (A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year, or (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business. Such term also includes timber with respect to which subsection (k) (1) or (2) is applicable.

In the instant proceeding there is no doubt but that the houses in question were property used in the petitioner's trade or business of a character which is subject to the allowance for depreciation on real property used in the petitioner's trade or business within the meaning of section 117(j), for the individual dwellings in question were rented by petitioner and during the taxable years deductions for depreciation have been allowed on them. Thus, the general definition appearing before the two exclusions provided for in subsections (A) and (B) is satisfied. That provision of the Code continues, however, and in subsection (B) excludes from the definition of "property used in the trade or business" the *property held by the taxpayer primarily for sale to customers in the ordinary course of the taxpayer's trade or business*. To some extent these provisions of the Code may be overlapping, *Rollingwood Corporation* v. *Commissioner* (C. A. 9, 1951), 190 F. 2d 263. Whether or not the houses sold by petitioner satisfy the requirements of subsection (B) depends upon the fact situation, and the burden is on the petitioner to show that the houses sold during the taxable years were not held primarily for sale to customers in the ordinary course of its trade or business. In the recent case of *Mauldin* v. *Commissioner* (C. A. 10), 195 F. 2d 714, affirming 16 T. C. 698, the court said:

There is no fixed formula or rule of thumb for determining whether property sold by the taxpayer was held by him primarily for sale to customers in the ordinary course of his trade or business. Each case must, in the last analysis, rest upon its own facts. There are a number of helpful factors, however, to point the way, among which are the purposes for which the property was acquired, whether for sale or investment; and continuity and frequency of sales as opposed to isolated transactions. [Citing cases.] * * *

The facts in the instant case seem to clearly establish that petitioner constructed these houses primarily for rental purposes and not for sale and they were so held and used until some time early in the year 1946. Therefore, we have found in our Findings of Fact that the one house which petitioner sold in its fiscal year ending June 30, 1945, was not being held primarily for sale to customers in the ordinary course of its business. The profit which petitioner realized from the sale of this house is taxable as capital gain as petitioner contends and not as ordinary income as the Commissioner has determined. As to the gain from the sale of this house, the petitioner is sustained. However, after a careful consideration and study of all the facts we are unable to make the same kind of holding as to the gains which petitioner realized from the sale of the 42 single family houses during its fiscal year ending June 30, 1946. We think that the facts which were proved at the hearing of this proceeding justify our finding of fact that "The 42 houses which petitioner sold in its fiscal year ending June 30, 1946, were held primarily for sale to

customers in the ordinary course of its business from some date early in the year 1946 and prior to April 10, 1946 when the first of the 42 houses here involved were sold."

In the course of the testimony of petitioner's witness Charles E. Pence the following questions and answers occur:

Q Do you recall having a discussion with Mr. Frank Kessler concerning these houses along the latter part of 1945 or the first of 1946?

A Yes; we had quite a little discussion on them.

Q Where did that discussion take place?

A When we were at lunch a couple of times and over to the lumber yard two or three times.

Q Will you state what you might have said at these times you refer to and what Mr. Kessler said?

A Well, about that time we had many returned veterans in our office who wanted to buy houses. You couldn't hardly build houses in 1946; it was getting pretty rough. A lot of those boys would accuse us of sitting around while they were in the war. They wanted to buy houses. It struck me with possible advancing market conditions——

Mr. HAGEN: If the Court please, respondent objects to this line of testimony on the grounds it is speculative, also not responsive to the question.

The COURT: I overrule the objection.

A Frank kind of insisted we had better begin letting them have them. They wore me down. I felt like the Government had given them a pretty good chance for a cheap investment; but I would rather have kept them all that period of time.

Petitioner's witness Frank M. Kessler who is a stockholder and treasurer of petitioner and who was released from the Navy January 10, 1946, testified in part as follows:

Q Shortly after your return home was there some conversation between you and the other stockholders and officers regarding the houses which are in controversy?

A Yes, sir.

Q What was the nature of that? Just tell the Court.

A We had conversations in the early part of January as to the properties which were owned by Victory Housing No. 2, and at that time I expressed my opinion to the stockholders that it would appear to me that from all I could read the newspapers on my return from overseas, that veterans were having a pretty rough time getting housing; and in my opinion Victory Housing should change its policy as to the ownership of these houses and should make it possible for them to be owned by veterans returning from Service.

At that time my opinion in the matter was overruled by the other stockholders, but at subsequent meetings which were held—not regular stockholders meetings, but meetings between my brother and myself and Pence; the three of us controlled the majority of the stock in the corporation. We periodically had lunch together—apparently I was able to drive my point home to the other stockholders that we had performed a service to the country in building these, this war housing during the war, we had fulfilled our obligations to the Federal Housing. Now we had a further obligation and that was to provide veterans returning with housing. And the reason that that was more firmly driven home to me and perhaps my arguments with my partners or with my—the other mem-

bers of the corporation were more effective was by reason of the fact, Your Honor, that when I left for service my job in the lumber yard was pure and simple selling. When I came back, my terminal leave was over and I got back in the business, I found I was no longer a salesman. We had nothing to sell. It was impossible to get building material; it was impossible to build houses. And we began to feel that, contrary to popular conception, that Wichita would be the No. 1 "bus town" during the rapid increase in population during the war. It began to develop the town was going to level off, and that Boeing, whose peak employment was something over thirty thousand, was shut down and became a ghost plant.

In spite of that, the town began to pick up population. And for that reason housing became even more critical. It was impossible for returned veterans to obtain housing.

*So I was able to prevail upon the others in this corporation and we did offer these houses to veterans who came in to inquire about them.* [Emphasis added.]

The exact date when petitioner first offered these single family houses for sale is not shown by the record but it was some time early in the year 1946. Thus, under the foregoing testimony and other evidence in the record, we have made our finding of fact that: "The 42 houses which petitioner sold in its fiscal year ending June 30, 1946, were held primarily for sale to customers in the ordinary course of its business from some date early in the year 1946 and prior to April 10, 1946 when the first of the 42 houses here involved were sold and were so held at the time when sold." True it is that petitioner did not advertise the houses for sale. That was not necessary in order to sell them because there was a "seller's market" in housing in Wichita at that time. All parties seem to agree on that fact. It is best illustrated by the fact that from April 10, 1946, to June 30, 1946, petitioner sold 42 houses and from July 6, 1946, to October 1, 1946, petitioner sold the remaining 40 single family houses which it owned. The frequency of these sales, we think, meets the continuity test which the Court mentioned in *Mauldin* v. *Commissioner*, *supra*. On this issue we hold in favor of the Commissioner. Cf. *Rollingwood Corporation* v. *Commissioner*, *supra*, affirming a Memorandum Opinion of this Court, and *Albert Winnick*, 17 T. C. 538. In the *Winnick* case, among other things, we said:

* * * There may be a change of intent between the time of acquisition and the time of sale, and if property originally acquired for investment is held in the taxable year primarily for sale to customers in the regular course of trade or business, the gain realized in the taxable year is not subject to capital gain treatment. This conclusion is based on the language of section 117 which, in the definition portions of both subsections (a) and (j), speaks of "property held by the taxpayer" rather than property "acquired" or "purchased." *Richards* v. *Commissioner*, 81 F. 2d 369. This view was expressed clearly in the *McGah* case *supra*, where we said:

It has been held that an original status of property is not determinative of the question of whether it was, at the time of its sale, held for investment purposes or for sale to customers. See *Carl Marks & Co.*, 12 T. C. 1196,

1202, where this Court said that the "crucial factor to consider in determining the character of" the property in question is the purpose for which it was held during the period in question, i. e., in the taxable year.

It is unnecessary to reexamine in detail the legal questions involved but these cases above cited are authority for the following propositions of law relevant here: The question is one primarily of fact with the burden on petitioner. The tests most frequently applied are the continuity and frequency, and substantiality of sales, though other factors are relevant. An original purpose of rental is not binding on subsequent years. The fact of renting properties does not preclude their being held for sale to customers in the ordinary course of trade or business. On the last proposition, see also *King* v. *Commissioner*, 189 F. 2d 122, affirming a Memorandum Opinion of this Court, certiorari denied 342 U. S. 829.

Having considered all the facts, we hold that the 42 houses in question were held primarily for sale to customers in the ordinary course of trade or business during the taxable year in question, and consequently the gains realized from their sales were ordinary income.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

MURDOCK, *J.*, dissenting: I do not find in this case or in other decided cases a satisfactory rationale in regard to the application of section 117(j). This case presents the difficulty rather clearly. Back of section 117(j) is the thought that a part or all of the profit realized from a sale was due to an increase in value which occurred during the period while the property was held for investment and Congress has deemed it proper to tax that profit as a capital gain as distinguished from the ordinary gain which results from sales to customers in the ordinary course of a business.

A decision of the owner to sell must necessarily precede every sale, and after he makes that decision he is holding the property for sale until he succeeds in selling it. This taxpayer was not in the business of selling property, but if he had happened to be in the business of selling similar property, then his sale of this property would be just like the sale of any other property in that business. Yet it has been recognized that property, which under some circumstances would be held primarily for sale to customers in the ordinary course of the owner's business can, nevertheless, be held by that same taxpayer, not for that purpose, but for another so that when he sells, section 117 (j) will apply.

The petitioner was formed "for the purpose of entering into the business of constructing rental houses for defense workers." It never built any houses for sale and it had no sales force. It was not organ-

ized for selling. The houses in question were built in accordance with the purpose of the corporation as rental houses and they were actually rented for a number of years. They were only a part, and, apparently, not the greater part, of the rental housing owned by the corporation. It had a broker sell them. The petitioner never changed its business or original purpose to include a selling business, and it never converted the 42 houses from its rental business to any such new selling business. These facts are different from those in the *Winnick* case.

I should think that a taxpayer, organized as the petitioner was to construct rental properties and not as a selling organization, should be permitted to sell even a substantial number of its units, at least through a broker, without losing the benefit of section 117(j), and if that can happen in any case, I do not understand what there is about this case which prevents the application of 117(j).

Maybe section 117(j) would not apply to this petitioner if, for example, it went into the selling business and decided to use its rental houses as stock in trade to carry on that selling business. But it did not do that and this record fails to show that it had any customers or that it had a course of business of selling houses for profit or that these particular houses were held for sale to customers in the ordinary course of any such business. So I do not understand why the result reached is the right one.

RICE, *J.*, agrees with this dissent.