Bildwell, Inc. v. Commissioner.
Bildwell, Inc. v. Commissioner
Docket No. 36016.
United States Tax Court
1952 Tax Ct. Memo LEXIS 61; 11 T.C.M. (CCH) 1018; T.C.M. (RIA) 52302; October 23, 1952
*61 Income: Ordinary or capital gain: Sec. 117 (j), I.R.C. - During 1945 petitioner completed construction of twenty-five residential defense houses with the purpose of immediately selling one-third and renting the others pursuant to certain restrictions. Petitioner sold twelve houses prior to October 1945 and within six months of their completion. In October 1945 restrictions on sales were revoked and petitioner continued its sales activities. Held, that eight houses held for more than six months and sold during the period of October 1945 to the close of fiscal year ending June 30, 1946, were held primarily for sale to customers in the ordinary course of business and the gain was taxable as ordinary income. Robert Ash, Esq., 550 Munsey Bldg., Washington, D.C., and Carl F. Bauersfeld, Esq., for the petitioner. Thomas C. Cravens, Jr., Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: This proceeding involves a deficiency of $780.75 in declared value excess-profits tax for the fiscal year ended June 30, 1946. The sole question presented is whether the gains realized by petitioner from the sale of *62 eight defense housing units during the taxable year, are taxable as long-term capital gains or as ordinary income. Findings of Fact The facts which have been stipulated are found accordingly and included herein by reference. The petitioner, a Florida corporation with principal office at Lakeland, Florida, filed its income and declared value excess-profits tax returns for the period involved with the collector of internal revenue for the district of Florida. The petitioner's incorporators and first officers and directors were James L. Ewell president, John R. Wright vice-president and treasurer, and G. B. Green secretary. Ewell had been engaged, since 1930, in the business of heavy commercial construction and other lines of business but not residential construction. Wright had been engaged, since 1921, in the insurance, mortgage and investment business in Lakeland, Florida. The purpose of organizing petitioner was to construct residential houses under Title VI of the National Housing Act for rental to defense plant workers in the area of Lakeland, Florida, where a housing shortage existed. The petitioner was incorporated on February 27, 1942, with an authorized capital stock *63 of 100 shares of $100 par value common stock. Its certificate of incorporation authorized petitioner to engage in business including "building construction, investments in all and any property of any kind * * *, and the buying, selling and otherwise dealing with the same; * * *." Shortly after incorporation an allocation to petitioner to build 20 defense houses was rescinded and petitioner's organization was not completed until May 1944 following a new allocation by the National Housing Agency for petitioner's construction of 25 houses in the Lakeland area. On or about May 26, 1944, Ewell conveyed to petitioner certain land valued at $3,300 and paid in $1,100 cash and petitioner issued him 44 shares of stock. On the same date Wright conveyed to petitioner certain land valued at $4,500 and petitioner issued 44 shares to him and 1 share to Green. The petitioner's outstanding capital stock remained at $8,900 during the times material here. On June 10, 1944, the petitioner filed with the National Housing Agency, Federal Housing Administration Office, Jacksonville, Florida, two applications on Form WPB - 2896 for priorities for construction materials for a total of 25 single family, detached, *64 residential units. Those applications specified the location of the building lots, the type of construction, number of rooms, etc., the estimated cost, the rental per month and the range of sales prices. With regard to the necessity for the proposed construction, the applications stated that the houses would provide "additional living units to be rented to war workers". Further, the applications stated that, except as provided in General Orders 60-2 and 60-3 of the National Housing Agency, the petitioner would not rent the houses to persons other than eligible war workers as defined in General Order 60-1 of that Agency and would not dispose of or contract for the disposal of any of the houses. The applications were approved on June 10, 1944, subject to a limited preference rating. On or about August 1, 1944, petitioner as the owner and J. L. Ewell as the contractor entered into a written contract whereby, inter alia, Ewell agreed to furnish all materials and perform all work in the construction of 25 houses in accordance with certain specifications, and petitioner agreed to pay Ewell $80,000, subject to certain adjustments, upon completion of the houses and approval by the Federal *65 Housing Administration. Ewell's construction costs exceeded the agreed contract price and he incurred a loss of approximately $22,000. The petitioner financed the houses through F.H.A. insured loans from Finley-Tucker, a private lending institution. At the time the construction was started on petitioner's 25 houses, the National Housing Agency, General Orders 60-2 and 60-3 as amended, provided that the owner of war housing units might sell one-third thereof to eligible civilian war workers immediately upon completion of construction but the remaining two-thirds had to be rented to eligible war workers. While petitioner's houses were under construction, petitioner sent a memorandum to the employees of a Lakeland plant engaged in war work. The memorandum stated the approximate completion date of 25 houses, the details of construction and equipment, the monthly rental and sales prices, and the fact that one-third of the houses could be sold immediately with the remainder held for rental to qualified persons. The bottom half of the memorandum consisted of an application form for purchase or rental. The rentals, which were on a month-to-month basis, were subject to the control of the *66 Office of Price Administration with which certain forms had to be filed by petitioner as landlord. During February 1945 four of petitioner's houses were completed and the remaining 21 were completed during April 1945, each on specified days as stipulated. In the Lakeland Ledger newspaper of Sunday May 27, 1945, the petitioner's houses were advertised for sale and rent. The ad stated that the National Housing Agency occupancy restrictions had been relaxed, "so that some of the houses * * * may now be sold or rented in the following order of preference: (1) Eligible civilan war workers, (2) Military personnel, (3) Resident war workers, (4) Veterans and families of absent military, (5) All others". The ad further stated that "Only six houses are now left for sale and five for rent * * *". During May and June 1945 petitioner sold seven houses which had been completed on April 1 and rented as follows: three for two months, one for one month, and three not at all. The profits realized on those houses were reported as short-term gains on petitioner's return for the fiscal year ended June 30, 1945. During the summer but prior to October 1945, and within six months from the completion *67 date on April 1, petitioner sold five houses which had been rented as follows: one for three months, one for two months, one for one month, and two not at all. The profits therefrom were reported as short-term gains on petitioner's return for the fiscal year ended June 30, 1946, and are not in question in the instant proceeding. In October 1945 the National Housing Agency revoked restrictions on the sale of defense houses owned by the petitioner. During the period from October 1945 to the close of the fiscal year ended June 30, 1946, petitioner sold eight houses, including five during October, November, December 1945, two in February 1946 and one in June 1946. From time of completion to date of sale those houses had been held for periods varying from approximately seven to fifteen months and had been rented for periods varying from approximately three to fourteen months. Depreciation was claimed and allowed on those houses in a stipulated amount. The profits from those sales, the amounts of which are not controverted, were reported as long-term capital gains on petitioner's return for the fiscal year ended June 30, 1946. The petitioner never owned more than 25 houses. At the *68 close of the fiscal year 1946 petitioner owned only five houses of which three were sold during fiscal 1947 and two during fiscal 1948. Prior to the time construction was completed on all 25 houses and on March 21, 1945, the petitioner's board of directors adopted a resolution placing the active management of the corporation's affairs in the hands of J. L. Ewell. The resolution authorized Ewell, as he deemed advisable, to purchase property; to obtain mortgage loans; and to sell the corporation's property and execute deeds of conveyance therefor. Acting on behalf of the corporation, Ewell intended to sell, immediately upon completion, as many houses as the National Housing Agency general orders would permit, which was one-third of them at that time. However, 12 houses completed on April 1, 1945, were sold within the following six months' period, or, approximately one-half of the houses built. Some of those houses were sold to the tenants after not more than three months' occupancy while five had not been rented at all. Of the remaining 13 houses held by petitioner for more than six months after completion, including the eight houses involved herein, the rental periods varied from *69 three months to a little over a year so that some of them were vacant at various times. The vacant houses were unprofitable and the rented houses presented troublesome maintenance problems. Sometime during 1945 Ewell decided to sell the petitioner's remaining houses as they were vacated by tenants and as soon as permitted to sell under general orders issued by the National Housing Agency. That decision to sell was made prior to October 9, 1945, the date of sale of the first of the eight sales involved. The eight houses, here in controversy, which petitioner sold during the fiscal year ended June 30, 1946, were held primarily for sale to customers in the ordinary course of its business from a time prior to October 9, 1945, and on the respective dates of sales. Opinion The question presented is whether the gain from the petitioner's sale of eight defense houses during the period of October 1945 to the close of the fiscal year ended June 30, 1946, is taxable as capital gain as contended by petitioner, or, as ordinary income as determined by respondent. The petitioner takes the position that the eight houses were built and owned for more than six months solely as rental properties *70 under defense housing restrictions and constituted "property used in the trade or business" so that the gains are treated as capital gains under section 117(j), Internal Revenue Code. [1] On the other hand respondent argues that, prior to October 9, 1945 and at the time of the sales, the houses were held primarily for sale to customers in the ordinary course of business within the exclusion provided in subsection (B) of section 117(j). Both parties correctly treat the issue as one of fact and the burden of proof rests upon the petitioner. *71 In Albert Winnick, 17 T.C. 538 (appealed to 6 C.A. November 23, 1951) and Victory Housing No. 2, Inc., 18 T.C. 466 we reviewed at some length the authorities and the tests formulated to determine the issue which is here presented. Each case rests on its own facts and circumstances, but there are a number of important factors which are to be considered in reaching the ultimate conclusion. One is the original purpose in acquiring the property, whether for sale or investment, but that initial purpose does not stamp the property with an unalterable status. There may be a change of intent between the time of acquisition and sale. If property originally acquired for investment (such as rental houses) is subsequently held in the taxable year primarily for sale to customers in the regular course of business, the gain on the sale is not subject to capital gain treatment, because section 117 (j) supra, speaks of "property held by the taxpayer" [italics supplied] rather than property acquired. Other factors include continuity of sales over a period of time, frequency of sales as opposed to isolated transactions, and sales activity by the seller or persons acting *72 on his behalf. In this case the petitioner engaged in no activity until it completed its organization in May 1944 for the purpose of constructing 25 residential defense houses. In applying for priorities for building materials petitioner stated that it would not rent or sell the houses except in accordance with restrictions imposed by the National Housing Agency. At the time construction was started and completed those restrictions permitted the immediate sale of one-third and required rental of two-thirds of the houses. From the testimony it is clear that, from the outset, petitioner intended to engage in selling its houses to the extent that was permitted and also hold other houses for rental only as required. Four of petitioner's houses were completed in February 1945 and presumably rented and 21 houses were completed in April 1945. Of the latter group, some were rented and some were not, but 12 were sold within six months and prior to October 1945. No explanation is given as to why the sales exceeded the restriction of selling only one-third of the houses. The restrictions on sales of petitioner's remaining houses were revoked in October 1945 and from that time to the close of *73 the fiscal year 1946 the continuity and frequency of petitioner's sales were maintained by the additional sales of the eight houses involved herein. It is clear from the record that petitioner suffered from vacancies in the houses which it held for rental and the testimony shows that the rented houses presented maintenance problems. Even though it may be said, as contended by petitioner, that the particular eight houses in question were built and held for more than six months for rental purposes as required by N.H.A. general orders, we think it is abundantly clear that petitioner changed its intention with regard thereto. Ewell, the president and active manager of petitioner's affairs, testified positively that, sometime during 1945, he decided to sell of petitioner's houses as they were vacated by tenants. Ewell's reason was the difficulties encountered with both vacancies and tenants. Ewell also testified that the decision to sell was made after he had acquired all of petitioner's stock. This did not occur until about April 15, 1946, at which time petitioner had sold all but six of its houses and we do not accept such testimony as establishing the date of the decision to sell. *74 In view of the October 1945 revocation of the restriction on sales of petitioner's remaining 13 houses theretofor held for rental and the actual continued sales activity, we conclude that petitioner's decision to hold the eight houses in controversy for sale was made prior to October 9, 1945, the date the first of those houses was sold. Accordingly, we conclude and have found as a fact that the eight houses in controversy which were sold during the period from October 1945 to the close of the fiscal year ended June 30, 1946, were held primarily for sale to customers in the ordinary course of business, from a time prior to October 9, 1945, and on the respective dates of sales. The respondent's determination is sustained. Decision will be entered for the respondent. Footnotes
1. SEC. 117. CAPITAL GAINS AND LOSSES. (a) Definitions. - As used in this chapter - (1) Capital assets. - The term "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include - * * *
(B) property, used in his trade or business, * * *
(j) Gains and Losses from Involuntary Conversion and from the Sale or Exchange of Certain Property Used in the Trade or Business. - (1) Definition of property used in the trade or business. - For the purposes of this subsection, the term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23 (1), held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not (A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year, or (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, * * *↩