Robert W. Dillon v. Commissioner.
Robert W. Dillon v. Commissioner
Docket No. 34470.
United States Tax Court
1953 Tax Ct. Memo LEXIS 320; 12 T.C.M. (CCH) 338; T.C.M. (RIA) 53099; March 30, 1953
*320 Capital gain or ordinary income. - Petitioner constructed 20 defense houses and rented them to war workers in accordance with National Housing Agency orders. Petitioner sold the houses in 1946. Held, the houses were held primarily for sale to customers in the ordinary course of business; the gain on the sale is taxable as ordinary income. Robert Ash, Esq., 550 Munsey Building, Washington, D.C., and Carl F. Bauersfeld. Esq., for the petitioner. Marvin E. Hagen, Esq., for the respondent. WITHEY *321 Memorandum Findings of Fact and Opinion WITHEY, Judge: The respondent determined a deficiency of $26,801.09 in the income tax liability of the petitioner for the calendar year 1946. The issue is whether or not a gain realized on the sale of 20 houses in the taxable year is taxable as ordinary income or as long-term capital gain. Petitioner's 1946 Federal income tax return reported the sale of 33 houses as long-term capital gains. Petitioner now agrees that the proceeds from the sale of 13 of the 33 houses are not taxable as long-term capital gains because the houses were held by him for less than six months. Our opinion relates to the remaining 20 houses. Findings of Fact The petitioner is an individual residing in Omaha, Nebraska. He filed his Federal income tax return for the calendar year 1946 with the collector of internal revenue for the district of Nebraska. Petitioner has been engaged in the business of building houses for sale since 1936. During the period from 1936 to 1941, inclusive, he built and sold from 20 to 25 houses each year, and in 1942 he built and sold 12 houses in Des Moines, Iowa. Petitioner financed the construction of these houses with short-term *322 bank or construction loans, running for periods of from 80 to 120 days, or in some instances he contracted to construct a house and the person for whom the house was built handled the financing. During those years he did not hold any property for rental purposes. After Government regulations prevented private building in Des Moines in 1943, petitioner went to Omaha, Nebraska, and discussed the housing situation there with Federal Housing Administration officials, hereinafter referred to as F.H.A. There was an acute housing shortage in that locality because of the fact that certain defense plants, such as Martin Bomber Plant, Meade Ordnance Plant and Offutt Air Force Base, were located in that area and many defense workers had moved there. The F.H.A. officials encouraged petitioner to move his operations to Omaha and build rental housing for war workers under Title VI of the National Housing Act. Petitioner did so and at the suggestion of the F.H.A. officials organized a corporation, known as Robert W. Dillon, Inc., hereinafter referred to as the corporation, for the purpose of carrying out the construction of houses. The corporation had an authorized capital stock of $25,000. Petitioner *323 contributed the sum of $4,300 to the capital of the corporation and the shares of stock issued were owned by petitioner and his wife. Under the F.H.A. program, it was necessary before beginning the building of houses to obtain priorities for materials from the War Production Board. In the fall of 1943 petitioner filed various applications with the War Production Board for preference rating on materials for construction of 40 defense houses, which applications were approved shortly thereafter. In all of the applications petitioner agreed to hold the houses for rent to war workers at a fixed monthly rental and not to dispose of them, except as authorized by General Orders 60-2 and 60-3 of the National Housing Agency. National Housing Agency General Order No. 60-3 was effective February 5, 1943, and was thereafter amended from time to time. Under this order the petitioner was required to rent the houses at specified rentals to authorized war workers. The war workers could purchase the houses after a minimum of four months, later reduced to two months, on specified terms, and at any time subsequent to 60 days after completion of such housing the owner could petition the National Housing *324 Agency to permit such housing to be disposed of otherwise than as provided in subsection 3.01 of General Order No. 60-3. The amendments to these regulations provided that on or after August 1, 1943, any one constructing such houses could sell one-third of them. The construction of the houses was financed by 25-year loans from the Western Securities Company of Omaha, Nebraska. Such loans were guaranteed up to 90 per cent of appraised value by the F.H.A. under Title VI of the National Housing Act. The loans were sufficient to cover both the cost of the lots and the cost of construction of the houses. Title to the land on which the houses were built was held in the name of the corporation. Applications for priorities were made in the name of the corporation and it signed the mortgages and notes with one exception, wherein application was made in the name of the petitioner. On December 27, 1943, the corporation, as owner, entered into a contract with petitioner, as contractor, for the erection of the defense housing units approved by the priorities. The 20 houses in issue were completed in 1944 and 1945 and the corporation deeded the houses to petitioner. Upon completion of the houses, *325 all of them were rented to war workers on oral month-to-month tenancies under rentals approved by the F.H.A. On October 15, 1945, all restrictions on the sale and rental of defense housing were removed by the National Housing Agency and the War Production Board. The houses could be sold to any purchaser at any price. Shortly thereafter petitioner decided to sell the 20 houses in question because he thought it was no longer economically sound to keep them. During the month of January 1946 some of the houses were advertised for sale in the Sunday edition of an Omaha newspaper. Most of the houses were sold to veterans, with the remainder going to tenants and other purchasers. Sales negotiations were handled by the Western Securities Company for which it received a commission of about 5 per cent of the sales price. In each instance after the sales were made the mortgages were paid off. The petitioner did not hold a real estate dealer's license in 1946. Petitioner held no other rental property during the years 1942 to 1945, inclusive, other than the houses he constructed under the defense housing program. The following schedule shows the number of houses constructed by petitioner, *326 the number of houses sold by petitioner, and the number sold by Robert W. Dillon, Inc., from January 1, 1942 to September 30, 1946: Sold
Constructed
by
By
By Robert W.
Year
Petitioner
Petitioner
Dillon, Inc.
1942
12
12
1943
6
6
1944
37
4
10
1945
56
23
17
1946
12
46
4
123
91
31
On hand September 30, 1946 - 1. Petitioner's gross rental income and Robert W. Dillon, Inc.'s gross rental income for the years 1942-1946, inclusive, was as follows: Gross Rentals
By Robert W.
Year
By Petitioner
Dillon, Inc.
1942
None
No Corporation
1943
None
Not Given
1944
$ 2,794.43
$1,929.64
1945
12,078.11
8,050.00
1946
4,951.69
Not Given
Petitioner's and Robert W. Dillon, Inc.'s gross selling price of houses, construction costs, and net selling price of houses were as follows for the years 1942-1946, inclusive: Petitioner
Gross
Construction
Year
Sales
Cost
Net Sales
1942
$ 68,953.30
$ 62,154.00
$ 6,799.30
1943
27,500.00
21,644.32
5,855.68
1944
19,915.46
16,078.66
3,836.80
1945
140,791.58
120,395.00
20,396.58
1946
118,313.42
114,533.74
3,779.68
1946
140,500.00 [1]
95,089.59 [1]
45,408.41 [1]
1946
108,150.00 [2]
75,816.49 [2]
32,333.51 [2]
*327 Robert W. Dillon, Inc.
1944
$ 56,900.00
$ 45,686.47
$11,213.53
1945
102,400.00
90,682.44
11,717.56
Petitioner's and Robert W. Dillon, Inc's net profit per books for the years 1942-1946, inclusive, including sales of houses and rentals, was as follows: Net Profit
Year
Petitioner
Robert W. Dillon, Inc.
1942
$ 4,970.16
No Corporation
1943
(284.31)
Not Given
1944
851.61
$9,291.80
1945
12,290.90
8,788.69
1946
(5,180.47)
Not Given
The respondent determined that all of the properties sold in 1946 represented ordinary income taxable 100 per cent. The 20 houses which petitioner sold during 1946 which previously had been rented were held primarily for sale to customers in the ordinary course of business. The houses were so held after October 15, 1945, and throughout the taxable year to date of sale. Opinion The issue before us is whether the 20 defense houses petitioner sold in the taxable year were held primarily for sale to customers in the ordinary course of business. Respondent's deficiency notice stated: "It *328 is held that the gains from sale of real estate which you reported on your 1946 return as capital gains represented ordinary income taxable 100 per cent under Section 22 (a) of the Internal Revenue Code. [1] Your income for that year has been increased, in accordance with this determination." Petitioner completed the construction of the 20 houses in issue in 1944 and 1945 under an approved F.H.A. plan. *329 Upon completion of the 20 houses, petitioner rented them to war workers. After the restriction on the sale of defense houses was removed petitioner decided to sell them. The 20 houses were sold during the period January 1, 1946 to August 8, 1946. Petitioner had been in the business of building and selling houses from 1936 to 1942 in Des Moines, Iowa. Because of Government restrictions on building materials, he was forced to discontinue private building and construct rental defense housing. He agreed to and did rent the houses constructed during 1944 and 1945 to war workers. After petitioner constructed 37 houses he and his corporation sold 14 of them in 1944 as authorized by the amendments to the National Housing Act. In 1945 and 1946 he constructed 68 more houses. He and his corporation sold 40 of these houses in 1945 and in 1946 they sold 50 houses, having one house unsold at the end of 1946. These sales cannot be characterized as isolated transactions, but constitute a continuous sales activity on the part of petitioner and satisfy the test normally applied in these situations. Rollingwood Corporation v. Commissioner, 190 Fed. (2d) 263. We are no0 able to determine *330 from this record the amount of petitioner's net rentals, but the record does disclose that his net profits therefrom could have amounted to only a small proportion of his net income. This fact strongly indicates that the holding of the houses for investment purposes was only temporary pending removal of sales restrictions. Rollingwood Corporation v. Commissioner, supra.
In order for sales of property to receive capital gains treatment, the petitioner must show that the property was not held "primarily for sale to customers in the ordinary course of his trade or business." Section 117 (a) and (j). [2] Petitioner has not done this. Petitioner's primary contention is that since the property here involved was orginally constructed and held for rental purposes, it thereby assumes an irrevocable characterization as investment property. This Court has stated that even though the original intent in the acquisition of property is to be given some consideration in determining the purpose for which the property is held, this is not the sole factor to be considered. Carl Marks & Co., 12 T.C. 1196. We must determine the purpose for which the property is held during *331 the taxable year in question. Albert Winnick, 17 T.C. 538, vacated and remanded for additional findings of fact, 199 Fed. (2d) 374. *332 From the record it is apparent the houses were held for rental purposes to October 15, 1945, the date when the restrictions on the sale of defense housing were removed. The record also shows that after that date the houses were held for sale. This question is one of fact. Rubino v. Commissioner, 186 Fed. (2d) 304; Lucille McGah, 17 T.C. 1458; Victory Housing No. 2, Inc., 18 T.C. 466 (on appeal, C.A. 10). For that reason no beneficial purpose would be served in distinguishing the cases cited by petitioner. Consideration of all of the facts in this record leads us to the conclusion that the 20 houses in question were held primarily for sale to customers in the ordinary course of business in the taxable year and net profits derived from the sale thereof during said year are taxable as ordinary income. Decision will be entered for the respondent. Footnotes
1. 20 houses in issue. SEC. 117. CAPITAL GAINS AND LOSSES. (a) Definitions. - As used in this chapter - (1) Capital Assets. - The term "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or property, used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23 (1), or an obligation of the United States or any of its possessions, or of a State or Territory, or any political subdivision thereof, or of the District of Columbia, issued on or after March 1, 1941 on a discount basis and payable without interest at a fixed maturity date not exceeding one year from the date of issue, or real property used in the trade or business of the taxpayer; * * *
(j) Gains and Losses from Involuntary Conversion and from the Sale or Exchange of Certain Property Used in the Trade or Business. - (1) Definition of Property Used in the Trade or Business. - For the purposes of this subsection, the term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23 (1), held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not (A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year, or (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business. Such term also includes timber with respect to which subsection (k) (1) or (2) is applicable. (2) General Rule. - If, during the taxable year, the recognized gains upon sales or exchanges of property used in the trade or business, plus the recognized gains from the compulsory or involuntary conversion (as a result of destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation or the threat or imminence thereof) of property used in the trade or business and capital assets held for more than 6 months into other property or money, exceed the recognized losses from such sales, exchanges, and conversions, such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months. If such gains do not exceed such losses, such gains and losses shall not be considered as gains and losses from sales or exchanges of capital assets. For the purposes of this paragraph: (A) In determining under this paragraph whether gains exceed losses, the gains and losses described therein shall be included only if and to the extent taken into account in computing net income, except that subsections (b) and (d) shall not apply. (B) Losses upon the destruction, in whole or in part, theft or seizure, or requisition or condemnation of property used in the trade or business or capital assets held for more than 6 months shall be considered losses from a compulsory or involuntary conversion.
[2]↩ 13 houses conceded by taxpayer as taxable as ordinary income.
1. SEC. 22. GROSS INCOME. (a) General Definition. - "Gross income" includes gains, profits, and income derived from salaries, wages, or compensation for personal service (including personal service as an officer or employee of a State, or any political subdivision thereof, or any agency or instrumentality of any one or more of the foregoing), of whatever kind and in whatever form paid, or from professions, vocations, trades, businesses, commerce, or sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever. * * *↩