H. Truman Browne v. Commissioner. Bettie Browne v. Commissioner.
H. Browne v. Commissioner
Docket Nos. 29880, 29881.
United States Tax Court
1953 Tax Ct. Memo LEXIS 214; 12 T.C.M. (CCH) 669; T.C.M. (RIA) 53211; June 11, 1953
*214 In 1946, petitioner, a dealer in real estate, sold a war-housing project of 25 single-dwelling units and an unimproved adjacent lot. Held, the houses and the lot were held primarily for sale to customers in the ordinary course of petitioner's trade or business and were not entitled to capital gains treatment under Sec. 117 of the Internal Revenue Code. Clinton F. Seccombe, Esq., 727 West Seventh Street, Los Angeles, Calif., and Erwin Lampe, Esq., for the petitioners. B. H. Neblett, Esq., for the respondent. RICE
Memorandum Findings of Fact and Opinion These proceedings, consolidated for purposes of hearing and opinion, involve deficiencies in income tax for the calendar year 1946 of $11,181.37 for H. Truman *215 Browne and $11,162.58 for his wife, Bettie Browne. The issue to be determined is whether the gain from the sale of certain residential properties and an unimproved lot were properly treated by petitioners as a long-term capital gain; or whether such gains, as respondent asserts, constituted ordinary income. Some of the facts were stipulated. Findings of Fact The stipulated facts are so found and are incorporated herein. H. Truman Browne (hereinafter referred to as the petitioner) and Bettie Browne were husband and wife during the entire year of 1946, residing together in Palos Verdes, California. They filed separate returns for such year with the collector of internal revenue for the sixth district of California, at Los Angeles. Petitioner has been a licensed real estate broker in California since 1939. His principal activity from 1940 to 1947 was as an officer of Highland Builders, Inc. (hereinafter referred to as Highland), of which he was president, manager, and sales agent. He owned one share of stock of a total of 370 outstanding shares. None of the other stockholders were related to petitioner by either blood or marriage. Highland, from 1942 to 1944, constructed *216 some 400 houses for others. It did not own the land on which the houses were built, nor did it have any interest in the sale thereof. During the same period, it also constructed approximately 100 houses for itself, and subsequently sold them. In addition to its construction activities, the firm was also owner of two oil leases in the Los Angeles area and a quarry in San Francisco, from which it excavated and sold fill. Petitioner's salary from Highland, in 1946, was $3,250. In addition to his full-time employment by Highland, petitioner, during the same time, was engaged in several side-line activities. Among these was the so-called Richardson Manufacturing Company (a sole proprietorship), a small cabinet-making shop, manufacturing ironing boards and medicine cabinets. It owned no realty and occupied leased premises. Petitioner reported a loss of $29,553.01 in 1946 from this venture. Petitioner, in 1944, organized the New House Building Corporation and held all of its stock. The firm was inactive until the latter part of 1945, when it qualified as a construction company by hiring a registered contractor. The firm then built some 24 or 25 houses for others. It had no ownership in *217 the land nor interest in the sale of the houses. In this venture, petitioner sustained a loss of about $60,000. His salary from this corporation, in 1946, was $3,000. In 1946 or early in 1947, he built and opened his own office for real estate brokerage purposes. A stenographer and salesman were employed in this office. The petitioner, personally, attended to business there only on weekends. In this capacity he and a salesman undertook to procure certain lots for one Flodine for building purposes. Other brokerage services were performed in connection with Flodine's building activity. Unable to pay petitioner and his salesman for their services, Flodine gave them an equity in some 15 houses in the Lawndale area. Petitioner reported income from this source (Lawndale Building Project), in 1946, of $3,564.93, expenses of $4,355.81, and a net loss of $790.88. The petitioner also owned two commercial buildings, which he rented, and held leases on other properties which he sulet. Petitioner was also a beneficiary of one-fourth of the May Isabel Campbell-Johnston Trust. Part of its corpus consisted of houses in Redondo Beach, California. This trust was liquidated in 1946, and petitioner *218 received approximately $96,000 as his share. Shortly after Pearl Harbor, December 7, 1941, the Federal Housing Administration (hereinafter referred to as the F.H.A.) enlisted the aid of lumber dealers and contractors throughout the country in an effort to have defense-housing developments constructed as quickly as possible. Petitioner, in 1943, secured necessary Government priorities for the construction of 25 single-dwelling units in Lennox, California, a locality near military and defense-production installations. Regulations of the National Housing Authority permitted one-third of the dwellings constructed with priority orders to be sold. Petitioner agreed to and did rent all 25 houses which he constructed. The houses were built by a general contractor on unimproved lots, for which petitioner had paid $13,200. Construction was financed through the Bank of America, F.H.A. approved loans. Estimated life of the structures was 30 years. Depreciation was allowed in computing income taxes. Six of the houses were completed in June of 1944, the remaining 19 by December 1, 1944. The houses were rented under month-to-month tenancy agreements, with the Bank of America as collection agency, *219 for $51.50 per month until April 1, 1946. The rent was then increased to $56.50 per month as a result of the construction of garages for each house. This rental figure also included the cost of upkeep of lawns and general gardening services. Petitioner's venture in rental war housing was carried on under the name "Truman Enterprises". By October 15, 1945, all restrictions on the sale of war housing were removed by the National Housing Agency. Petitioner sold three of the Lennox houses in May 1946, two of them to tenants. He continued renting the remaining houses until the Fall of that year, when all were sold during the months of October, November, and December. On June 17, 1946, petitioner applied to the Bank of America for an unsecured cash loan of $75,000. In a personal financial and property statement, filed with the Bank of America on May 1, 1946, petitioner designated himself as "builder, developer, sales agent". He listed, among his assets, "real estate held for current sale", 25 dwellings in Lennox, California, market value of $221,000, under mortgage of $116,343.18, net equity of $104,656.82. Also listed among his assets was "real estate held for investment purposes." Under *220 this category were listed the two commercially rented properties, stumpage acreage in Vermont, and his home. Among the petitioner's liabilities was a $5,000 unsecured Bank of America loan and a $35,000 unsecured Security First National Bank loan. The stated purpose of the $75,000 loan was to repay these two obligations, to secure additional funds for the improvement of petitioner's commercially rented property, and for working capital for the sale and distribution of factory designed homes. The Los Angeles Loan Committee of the Bank of America disapproved petitioner's application on the grounds that his financial statement of May 1st did not warrant the extension of unsecured credit. The Committee indicated its willingness to consider additional borrowing on a properly secured basis. Petitioner's net worth as of May 1, 1946, was $752,445.38. On July 31, 1946, petitioner applied to the Bank of America for 44 real estate loans in the aggregate amount of $241,020. These loans constituted, in effect, a refinancing of the remaining 22 Lennox houses and the May Isabel Campbell-Johnston Trust properties. In applying for these loans, petitioner proposed the immediate sale of all his houses *221 to veterans. Petitioner's application was approved by the Los Angeles Loan Committee of the Bank of America on August 9, 1946. The sum of $45,000 was advanced to petitioner at that time on his unsecured note, and was used to repay the Security First National Bank unsecured loan of $35,000 and to repay the unsecured and then past-due Bank of America loan of $5,000. Sale of the houses was undertaken through an independent broker, and was completed by early December. Petitioner's 1946 income tax return shows net long-term capital gains of $89,385.19, salaries of $6,250, against net operating losses of $58,885.33, for his other business ventures. Petitioner reported a gain of $86,603.46 from the sale of all 25 Lennox houses and an adjoining lot. He treated such gain as a long-term capital gain, taxable in the amount of $43,301.73. Respondent determined that gain from the sale of the aforementioned property constituted ordinary income, taxable as such in the full amount of $86,603.46, and determined the deficiencies herein. The 25 Lennox houses and the adjacent lot were properties held in that year primarily for sale to customers in the ordinary course of business, and the gains realized *222 from their sale are taxable as ordinary income. Opinion RICE, Judge: Section 117 (a) of the Internal Revenue Code excludes from the definition of capital assets and section 117 (j) of the Code excludes from the definition of property used in the trade or business "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." Unless the petitioner sustains the burden of proving that the 25 houses and the adjacent lot were not "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business," the determination of the respondent that the gains thereon constituted ordinary income must be sustained. This is primarily a question of fact. King v. Commissioner, 189 Fed. (2d) 122 (C.A. 5, 1951), certiorari denied 342 U.S. 829 (1951); Rubino v. Commissioner, 186 Fed. (2d) 304 (C.A. 9, 1951), certiorari denied 342 U.S. 814 (1951). We recognize that there is no fixed formula for determining whether property sold by the taxpayer was held by him as a capital asset or held for sale to customers in the ordinary course of his *223 business activities. Blake v. Kavanagh, 107 Fed. Supp. 179 (E. D. Mich., 1952); Mauldin v. Commissioner, 195 Fed. (2d) 714 (C.A. 10, 1952); King v. Commissioner, supra. The facts of each case determine the proper category into which it should fall. There are guideposts, however, which are helpful in reaching the correct determination. Among those are: (1) the purpose for which the property was acquired, whether for sale or for investment; (2) the frequency of sales; (3) the nature and extent of taxpayer's business; (4) the activity of taxpayer and those acting for him, or on his instructions; and (5) the "crucial factor to consider", as we said in Carl Marks & Co., 12 T.C. 1196, 1202 (1949), "is the purpose for which they were held during the period in question". Petitioner puts great stress on the fact that he forswore the opportunity of constructing any war housing for sale, but chose rather to rent all which he built. He emphasizes their continued rental for approximately a year following the lifting, in October 1945, of all Government regulations banning the free sale of war housing. We have no doubt of petitioner's intent *224 to hold these houses for rental purposes upon their completion in 1944. He may not have decided in the Fall of 1945 to include them among property for sale to his customers. But the evidence is clear that, after May 1, 1946, he no longer held them for rental purposes. He listed them among "real estate held for current sale" in his financial statement of that date, filed with the Bank of America. He sold three of the houses by the end of May 1946. Plans for sale of the remaining 22 were underway by July 31st. All had been disposed of by December. We think the obvious change of petitioner's intent, the frequency and continuity of sales thereafter, coupled with the whole pattern of his business activity, can only lead us to the conclusion that the 25 houses were held primarily for sale to customers in the ordinary course of petitioner's business. Victory Housing No. 2, Inc., 18 T.C. 466 (1952), on appeal C.A. 10, November 20, 1952. Petitioner testified at the trial that the vacant lot in the Lennox area was sold to the Jefferson School under threat of condemnation. He testified further that it was being held for building purposes. There is conflicting evidence as to the *225 date the property was acquired, whether in 1942, as petitioner testified, or in June 1945, as he reported in his income tax return. Irrespective of what the immediate cause of sale may have been, we do not find sufficient evidence elsewhere in the record to warrant our holding that the sale of this parcel should not be accorded the same treatment as the houses. One adjustment made by respondent with respect to the liquidating dividend from the May Isabel Compbell-Johnston Trust was not contested by petitioner on brief and is deemed to have been abandoned. Decision will be entered for the respondent.